## UNITED STATES v. SACHER et al.
### No. 175, Docket 21537.

United States Court of Appeals
Second Circuit.

Argued Feb. 6, 1950.

Decided April 5, 1950.

Wolf, Popper, Ross & Wolf, New York City; for defendants-appellants Paul L. Ross, New York City; Earl B. Dickerson, Chicago, Ill.; Charles J. Katz, Los Angeles, Cal.; Patrick H. O'Brien, Detroit, Mich., of counsel; Thomas D. McBride, Philadelphia, Pa., of counsel for appellant McCabe. Robert W. Kenny, Los Angeles, Cal., Joseph Forer, Washington, D. C., and Bernard Jaffe, New York, N. Y., on the brief.

Irving H. Saypol, United States Attorney, New York City (Frank H. Gordon, Irving S. Shapiro, and Edward C. Wallace, Special Assistants to Attorney General, Lawrence K. Bailey, Attorney, Department of Justice, Washington, D. C., of counsel), for United States of America, plaintiff-appellee.

Briefs were filed by the following as *amici curiæ* in support of the appellants:

Robert J. Silberstein, Washington, D. C., for National Lawyers Guild.

Various attorneys on their own behalf.

William L. Standard, New York City (O. John Rogge, Washington, D. C., counsel), for various individuals.

Samuel A. Neuburger, New York City, for certain trade unions.

Witt & Cammer, New York City, for certain labor organizations.

Before AUGUSTUS N. HAND, CLARK and FRANK, Circuit Judges.

AUGUSTUS N. HAND, Circuit judge.

Eugene Dennis, John B. Williamson, Jacob Stachel, Robert G. Thompson, Benjamin J. Davis, Jr., Henry Winston, John Gates, Irving Potash, Gilbert Green, Carl Winter, and Gus Hall, were indicted in the United States District Court for the Southern District of New York for conspiring (1) to organize as the Communist Party of the United States a society teaching and advocating the overthrow and destruction of the United States Government by force and violence, and (2) to teach and advocate the overthrow of the United States Government by force and violence, contrary to Sections 3 and 5 of the Act of June 28, 1940, commonly known as the Smith Act. (Now 18 U.S.C.A. § 2385.) A jury found the indicted defendants guilty of the offenses charged. The present appeal, however, is not from the judgment of conviction under the Smith Act but only from orders adjudging Sacher, Gladstein, Crockett, McCabe, Isserman, and Dennis, guilty of contemptuous conduct while acting as attorneys during the pendency of the main trial. The question before us here is not as to the merits of the convictions under the indictment but as to the impropriety of the conduct of Sacher, Gladstein, Crockett, McCabe, Isserman and Dennis, which resulted in the adjudication of contempt.

The trial began on January 17, 1949, but selection of the jury was delayed because of a challenge on behalf of the indicted defendants to the entire jury system as administered in the Southern District of New York. This challenge went on from January 17 to March 1, 1949. It finally terminated only when the court fixed a limit for its conclusion, and filed an opinion rejecting the challenge.[1] In that opinion it was held by the court that the system administered in the Southern District was fair and made without discrimination of individuals or groups. After certain motions by defense counsel, the process of selecting a jury commenced on March 8 and was completed on March 17, 1949. Various witnesses for the prosecution were called between March 23 and May 19, when the Government rested after having called thirteen witnesses. The case for the defense was begun on May 23 and concluded, after hearing thirty-five defense witnesses, on September 23. Upon summation by counsel, the court charged the jury on October 13, who rendered a verdict of guilty against all the indicted defendants.

Upon entry of the verdict on October 14, the court, announced: "Now I turn to some unfinished business," and proceeded to read a portion of a contempt certificate and orders, made under Rule 42(a) of the Federal Rules of Criminal Procedure, 18 U.S.C.A., convicting the appellants of criminal contempts of court and imposing sentence. These orders imposed a sentence of four months imprisonment on Crockett, and Isserman, thirty days on McCabe, and six months on Sacher, Gladstein and Dennis. The certificate and orders were filed with the clerk immediately after the oral announcement. Each order recited that the named appellant was guilty of the contempts specified against him in the certificate, and sentence was imposed for each contempt with the direction that the sentences be "served concurrently." After the certificate and orders were made, each appellant addressed the court. Isserman objected to the findings in the certificate on the ground they were "wholly unwarranted by anything which has occurred in the course of this trial"; and, in respect to himself, were "but a reflection of the atmosphere of bias and prejudice which this court has shown and with which this entire trial was attended from the first day." He also argued that this was "an effort to intimidate members of the bar in their bounden duty to represent their clients to the best of their ability * * *". He ended by making a motion to vacate the certificate, which was denied.

Sacher recognized that "the power rests in the Court to act summarily," but added that the lawyers should be given "an opportunity to be heard before they are found

1. U. S. v. Foster, D.C., 83 F.Supp. 197.

guilty and sentenced." To this the court replied: "Let me say this to you, Mr. Sacher: as to these contempt adjudications, let them be notice to you and to all who may be tempted to follow your example that there is power in the judicial system of the United States under the Constitution and the laws of the United States to protect and maintain the dignity of the court * * *".

Thereupon, Gladstein stated that he had committed no contempt of court and had done no more than defend the rights of his clients. Crockett made a similar statement, as did McCabe. Finally, Dennis said that: "This trial and the verdict, is an evil and an illegitimate product of a bipartisan conspiracy * * * of men who want to destroy the Bill of Rights and peace, and I think that the adjudgment of counsel * * * is in keeping with the sinister and police state character of this trial."

A copy of the certificate which the judge filed under Rule 42(a) is set forth as an appendix to this opinion.

In preparing and filing the Contempt Certificate, and imposing the sentences, the court purported to act under summary powers conferred by 18 U.S.C.A. §§ 401 and 402.[2]

Rule 42 of the Federal Rules of Criminal Procedure provides:

"Rule 42. Criminal Contempt

"(a) *Summary Disposition.* A criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record.

"(b) *Disposition upon Notice and Hearing.* A criminal contempt except as provided in subdivision (a) of this rule shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the United States attorney or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest. The defendant is entitled to a trial by jury in any case in which an act of Congress so provides. He is entitled to admission to bail as provided in these rules. If the contempt charged involves disrespect to or criticism of a judge, that judge is disqualified from presiding at the trial or hearing except with the defendant's consent. Upon a verdict or finding of guilt the court shall enter an order fixing the punishment."

In discussing the power to punish without notice or hearing contempts committed in the presence of the court, Justice Harlan said in Ex parte Terry, 128 U.S. 289, 306, 9 S.Ct. 77, 80, 32 L.Ed. 405: " * * * upon the facts recited in the order of September 3d, showing a clear case of contempt committed in the face of the circuit

2. "§ 401. Power of court
"A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—
"(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
"(2) Misbehavior of any of its officers in their official transactions;
"(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."
§ 402 provides that certain contempts shall be prosecuted by jury trial, but concludes:

"This section shall not be construed to relate to contempts committed in the presence of the court, or so near thereto as to obstruct the administration of justice, nor to contempts committed in disobedience of any lawful writ, process, order, rule, decree, or command entered in any suit or action brought or prosecuted in the name of, or on behalf of, the United States, but the same, and all other cases of contempt not specifically embraced in this section may be punished in conformity to the prevailing usages at law."

court, which tended to destroy its authority, and, by violent methods, to embarrass and obstruct its business, the petitioner was not entitled, of absolute right, either to a regular trial of the question of contempt, or to notice by rule of the court's intention to proceed against him, or to opportunity to make formal answer to the charges contained in the order of commitment. It is undoubtedly a general rule in all actions, whether prosecuted by private parties or by the government,—that is, in civil and criminal cases,—that 'a sentence of a court pronounced against a party without hearing him or giving him an opportunity to be heard, is not a judicial determination of his rights, and is not entitled to respect in any other tribunal.' Windsor v. McVeigh, 93 U.S. 274, 277, 23 L.Ed. 914. But there is another rule of almost immemorial antiquity, and universally acknowledged, which is equally vital to personal liberty, and to the preservation of organized society, because upon its recognition and enforcement depend the existence and authority of the tribunals established to protect the rights of the citizen, whether of life, liberty, or property, and whether assailed by the illegal acts of the government or by the lawlessness or violence of individuals. It has relation to the class of contempts which, being committed in the face of a court, imply a purpose to destroy or impair its authority, to obstruct the transaction of its business, or to insult or intimidate those charged with the duty of administering the law." See also the remarks of Chief Justice Taft in Cooke v. United States, 267 U.S. 517, 534, 45 S.Ct. 390, 69 L.Ed. 767, to similar effect.

The appellants contend that the judge had no power to punish the defendants summarily because the conduct punished was not "committed in the actual presence of the court," and also because of the punishment imposed did not immediately follow the contemptuous acts. As for the first objection, it seems to be met by the findings in the certificate and many portions of the record that the judge had before him. The second objection we shall deal with after discussing the first. Neither of them, however, seems persuasive.

The argument in support of the first contention is largely based upon the preliminary remarks in the certificate, in which the judge said: "Before the trial had progressed very far, * * * I was reluctantly forced to the conclusion that the acts and statements to which I am about to refer were the result of an agreement between these defendants, deliberately entered into in a cold and calculating manner, to do and say these things for the purpose of: (1) causing such delay and confusion as to make it impossible to go on with the trial; (2) provoking incidents which they intended would result in a mistrial; and (3) impairing my health so that the trial could not continue."

The judge also said in his preliminary remarks that he would have overlooked the contemptuous conduct of counsel, or would have at most merely reprimanded them, if their conduct had appeared to be the result of the heat of controversy or zeal in the defense of a client rather than deliberate contempt. The appellants argue that the judge punished them because he found they were engaged in a conspiracy though he could not have witnessed the actual making of a joint agreement. But if the appellants' conduct described in the certificate was contemptuous and obstructive and involved contumacious acts at the trial, those acts were committed within the judge's sight and hearing. The judge's conclusion that they were the result of an agreement meant no more than that they were deliberate, and it was quite unimportant whether he believed that a prior conspiracy had been entered into. Indeed, he never said that such a conspiracy had been formed. He saw and heard the appellants deliberately delaying the trial, disregarding his orders, and accusing him of wrongdoing and corruption. This was enough to show wilful obstruction of the trial. There is nothing in his certificate indicating that there were any acts other than those which he saw and heard that determined his conclusions. Even if he regarded the appellants'

conduct as the result of an agreement made outside the courtroom, that view is unimportant and would not limit his power to impose summary punishment for contempt. His punishment could no more be revised because he held that view than could a sentence for an ordinary crime be reversed because the judge felt and said that a defendant had shown himself such an undesirable citizen in other transactions as to merit the imposition of unusually severe treatment. His reason for the length of the sentence would not affect its validity and should be ignored on appeal. The situation in Townsend v. Burke, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690, was quite different, for it there appeared that the fact which caused the judge to impose a long sentence was his erroneous information that the defendant had been previously convicted on certain charges, and that a sentence affected by that mistake was imposed upon a defendant who did not have the benefit of counsel.

The record appears to justify the findings in Specification I of the Certificate that the appellants "joined in a wilful, deliberate, and concreted effort to delay and obstruct the trial * * * for the purpose of causing such disorder and confusion as would prevent a verdict by a jury on the issues raised by the indictment; and for the purpose of bringing the Court and the entire Federal judicial system into general discredit and disrepute. * * *" It likewise bears out the findings of obstructive and contemptuous conduct with which the defendants are charged in subdivisions *a.* to *m.* of that specification. There seems to have been ample reason for the court's conclusion that the attacks on Judge Knox and the other judges of the Southern District and on the jury system, the Justice Department, the police, the newspapers and the President of the United States were launched with a similar purpose to divert the jury from the real issues, and to convert the case into a trial of the Government, rather than the indicted defendants.

When the indictment was moved for trial on January 17, 1949, defense counsel asked for a 90 day continuance on the ground that armed police in the Court House and newspaper accounts would prevent a fair trial. They also asked for a courtroom larger than the one in which the court was sitting so as to admit a larger public. On the denial of these motions the court on January 18 began consideration of the defendants' challenge to the jury panel and to the jury system as administered in the Southern District of New York—a challenge which it entertained although a similar one had been made on November 12 and withdrawn on November 16 preceding. Counsel then contended that the challenge should not be heard by any judge of the Southern District of New York, and in any event that Judge Medina should not sit because they might desire to call him as a witness. The judge stated that he had not participated in the local jury system, to which Sacher replied that even if he had not participated, a "lack of participation might legally, despite its paradoxical aspect, be regarded as participation * * *".[3] After counsel had separately refused to state whether they expected to call the judge as a witness, he ruled that if called he would refuse to testify. Such conduct by appellants was dilatory and obstructive. They then proceeded to call a member of the petit jury panel for the January 1949 Term named Allen and asked him what was "the assessed valuation of the home" in which he lived. The judge ruled that the witness might be asked whether he owned property in excess of the amount required to qualify for jury service, but could not be asked in detail of what his property consisted. After protracted arguments by Sacher, McCabe and Isserman, the original ruling was adhered to, which precluded details as to the juror's economic status. In spite of this, Isserman and Sacher continued to interrogate the witness as to details of his property holdings, his income, other information such as had been excluded by the court in previous rulings, and many quite irrelevant matters. These questions continued over many pages of the record. The prior rulings and objec-

---

3. Challenge Transcript, p. 1356.

tions were entirely sufficient to protect any rights which the indicted defendants had on appeal, and the repeated questions appear to have involved obstructive and dilatory tactics. In spite of this, the appellants called three more witnesses who were members of the petit jury panel and subjected them to the kind of detailed questions which had been excluded in the case of Allen. Upon the calling of Flanagan, a fifth member of the petit jury panel, the judge ruled that he would hear no more members of that panel until some direct proof of discrimination was furnished. Long and repetitious arguments then followed protesting against the rulings of the court and covering many pages of the record. Thereupon, the defendants' counsel called one Wilkerson, who testified that he had supervised the preparation of the statistics purporting to show disproportionate and discriminatory selection of the jurors in the Southern District.

On February 4, a question was asked and excluded, with repetitious and concerted arguments against the ruling by Isserman, Gladstein, Sacher, and McCabe.[4] Later during the same day, after a further question had been excluded by the judge, arguments of like character were made by Isserman, McCabe, Sacher and Crockett.[5] One has only to read these and many other arguments against the judge's rulings to be convinced that the conduct of the appellants was concerted and wilfully obstructive. At length on February 8, the court remarked: " * * * There has been a wilful, deliberate and concerted effort here to delay the proceedings. And I am going to see what I can do to prevent any further delay. * * * At first I couldn't think it possible, and then it began to dawn on me that maybe that is what was going on. And I mentioned it two or three times but it did not have any effect. And finally it has come to my mind that such is the fact, and I so find." [6]

Later the court said: "The finding I made the other day was based not only upon occurrences that appear in the min-

utes but upon what I have observed in the conduct of counsel before me here, sneering, snickering, obvious indications of one to another, 'Get up, it is your turn now, go at it next, keep this thing going,' and so on." [7]

In spite of this, counsel continued their arguments and objections regardless of the ruling of the court that an objection by one would inure to the benefit of all. On February 25, the judge had been so overwhelmed by talk that he ruled that he would receive no further argument on motions and objections, except where he requested it, and directed the defendants so to limit their proof on the jury challenge, that the trial could begin on March 7.

After the challenges were rejected and the actual trial had begun on March 7, a new motion for an adjournment of 90 days was made and denied. Moreover, Gladstein again attempted to challenge the array of jurors and to dismiss the petit jury panels of March 1 and March 7, and to introduce evidence and argue about these matters. Thereafter, there were repetitious objections and arguments on the question of the allowance of what appellants claimed were the proper number of peremptory challenges, and protests because of the examination of jurors on the voir dire by the court rather than by counsel. Further attacks upon the petit jury panel, with irrelevant allusions to the so-called "Jim Crow" policy of the Metropolitan Life Insurance Company in its Stuyvesant Town development, were made, and there were irrelevant arguments by Dennis as to the Chinese situation, the Greek situation, the State of Israel, German and Japanese monopolies, and the Marshall Plan. Repetitious arguments were made by Dennis, Sacher, Isserman, McCabe, Gladstein, and Crockett about taking the deposition of Foster, as to whom the case had been severed.

There were motions, accompanied by lengthy and repetitious argument, to strike out practically all the testimony of the first Government witness Budenz and the

---

4. See Appendix, Specification VI.
5. See Appendix, Specification VII.
6. Challenge Transcript 2839.
7. Challenge Transcript 3175.

exhibits introduced during his examination. On April 4, Gladstein persisted in pressing a line of cross-examination of Budenz which the judge had ruled out, and made insistent arguments when told to turn to other questions. On the same day, after Isserman had embarked on repetitious argument under the guise of stating his grounds of objection, the court ruled that neither Government nor defense could argue or state grounds of objection without permission of the court.

On April 25, when the judge had limited the introduction of a book by Karl Marx on "Value, Price and Profit" to such portions as might be shown to be relevant, repetitious objections were made by Gladstein, Sacher, and Dennis, until the judge was forced to leave the bench temporarily in order to stop the refusal by Dennis to obey his orders to abstain from argument.

On May 11, the judge announced that out of 8860 pages of the record already made, at least 1554 pages represented argument by defense counsel, without counting the testimony or what had been said by the attorneys for the Government, or by himself. In addition to persistent argument—often contrary to direct command of the court—the record shows frequent provoking statements and objections by the appellants concerning trivial matters.

On May 17, the judge said that he had "observed a number of things here which have impressed me as having been done solely for purposes of delay, perhaps to drag out this case for an indefinite period; * * *. Now, for example, I have observed as to exhibits, that an extremely long period is taken for the passing around of the exhibits, turning them over and over and passing them around, and 20 minutes or a half hour go by; and it seems to me that perhaps we can be a bit more expeditious." [8]

On June 3, one of the indicted defendants, Gates, was remanded to the custody of the marshal for refusing to answer a question on the witness stand, and the indicted

defendants Hall and Winston were likewise remanded for the balance of the trial. The latter two, as well as Dennis, acted in an obstreperous and contemptuous manner. In the turbulent scene which accompanied the rulings of the court, none of the appellants attempted promptly to restore order. Indeed, Gladstein, when asked by the judge if he did not think it would be prudent for the defendants to resume their seats, insisted that the court first rule upon his frivolous claim that the question put to Gates about the names of persons who were members of a committee involved a violation of constitutional rights.[9] This court has since held that the question was proper, and that the refusal to answer it was a contempt, and has affirmed Judge Medina's orders remanding Hall and Winston, and punishing Gates.[10]

On August 3, during the direct examination of Mrs. Lightfoot by Isserman, she was asked some questions by the court which Gladstein constantly objected to for no valid reasons. Finally, the questions were abandoned because of sheer obstruction whereupon Dennis ended the incident by moving for a mistrial because of the alleged hostile attitude of the court to the witness.

Throughout the remainder of the trial, there were persistent obstructive colloquies, objections, arguments, and many groundless charges against the court by the appellants of judicial misconduct. But since Judge Clark is of the opinion that none of the specifications should stand, and Judge Frank has concluded that the first specification should not stand, the orders will be affirmed upon the basis of certain later specifications.

### Sacher

The following additional findings of contemptuous acts and misconduct by Sacher are contained in the later specifications of the judge's certificate:

In Specification II, he charged that if the court was not to allow questions as to

---

8. Trial Transcript, p. 5827.

9. See Appendix, Specification XXVII.

10. United States v. Hall, 2 Cir., 176 F.2d 163, certiorari denied U. S. ex rel. Hall v. Mulcahy, 338 U.S. 851, 70 S.Ct. 90; United States v. Gates, 2 Cir., 176 F.2d 78.

the economic status of the petit juror Allen, "this hearing is no hearing; it is just a sham and a pretense designed to prevent the establishment of those facts which will prove that the system is precisely what we say it is."

In Specification V, he said: "This is an Alice in Wonderland procedure. We always get the sentence first and then the trial. * * * Is it because the evidence is becoming too devastating for the Government that we must now be circumscribed? * * * "

In Specification VI, he charged the judge with making certain rulings because of the presence in court of a large number of newspaper reporters.

In Specification VII, he indulged in persistent argument that the judge should change his ruling and permit general testimony as to the qualification of the inhabitants of the 18th Congressional District for jury service. This he did in addition to the argument to the same effect by Isserman, McCabe and Crockett.

In Specification VIII, he insolently suggested that the judge was favoring government counsel by giving the latter advance notice of when he would be called upon to proceed with his proof in respect to the challenge to the jury system.

In Specification XII, he made a sarcastic reference to Judge Knox which was accompanied by a somewhat similar reference by Isserman to Judge Medina. Neither remark was calculated to do anything but annoy the court and confuse the issues.

In Specification XIV, he charged the court with making a provocative remark, and added that "lawyers who are defending their clients for their liberty should not be treated as though they were dogs in the courtroom * * * ".

In Specification XVI, he said that: "No observations from the bench" would change his form of procedure. And when the court added that "you never can tell what will happen," Sacher replied: "With your Honor up there I suppose that is true."

In Specification XVII, he charged the court with preferential and unfair treatment by saying: "I see, only Mr. Gordon and Mr. Nicodemus may speak."

In Specification XIX, after argument by Gladstein and Dennis in support of the introduction in evidence of an entire book, Sacher impertinently remarked: "* * * we are being stopped from proving the truth."

In Specification XXV, he indulged in argument with the judge contrary to the latter's rulings.

In Specification XXVII, Sacher, instead of trying to quell the uproar when Gates had been remanded by the court, joined in making the absurd contention that Gates was entitled to disobey the court by invoking rights under the Fifth Amendment to the Constitution.

In Specification XXVIII, he again was reprimanded for argument and shouting.

In Specification XXIX, he claimed that the witness Green was being "crucified unnecessarily with interrogations."

In Specification XXX, he interjected in respect to the cross-examination of the defendant Green, though he did not represent the latter, "I would like to quote the court and say: 'This is very small picking.' "

In Specification XXXI, he accused the court of "[unjustified] remarks * * * designed to prejudice the jury against the defendants."

In Specification XXXIII, he virtually accused the court of an unjust ruling and persisted in arguing.

In Specification XXXVI, he persisted in argument and in effect charged the court with favoring the Government counsel.

In Specification XXXVII, he charged the court with seeking to prejudice the jury against defense counsel.

In Specification XXXIX, he impertinently said: "Will there come a day, your Honor, when you will hear us?"

In respect to Specifications XV and XVIII, which are printed in the Appendix, the gist of each charge seems to be that Sacher was attempting to mislead the court. This we do not think is sufficiently clear and we, therefore, hold that the convictions

under Specifications XV and XVIII, as well as under Specification 1, should be reversed, but that his other convictions should be affirmed.

Sacher's contention that on January 26, 1949, the judge exculpated him from any charge of misconduct when he said that Sacher had thus far spoken "in good taste" would, at most apply only to Specification II, and leaves him vulnerable as to that specification in view of his many later acts of misconduct which colored prior transactions.

### Gladstein

The following findings, in addition to those of Specification I, were made as to Gladstein:

In IV, during the challenge to the jury system, he charged the court with prejudgment; and later, when invited to submit a memorandum of law, said that he would "if there is any possibility of having the effect of [the] authorities respected." Upon the court's criticizing him for his impertinent insinuations, he added: "It isn't half of what I felt like saying, your Honor, as a result of what you said."

In VI, he contemptuously persisted in burdensome argument.

In VIII, during the jury challenge, he in effect angrily charged the judge with keeping out evidence because he didn't like the way Gladstein and his colleagues had been behaving.

In X, he asked the judge to reconsider his ruling with respect to a document which he had declined to admit in evidence, and said: "upon the pretext that this is a confidential document, * * * you are preventing me from showing * * * the corruption of the system here in so far as they placed in charge of it a man who was the director of a dozen corporations, * * * ". In spite of a reprimand by the judge and his direction to desist from arguing, Gladstein continued.

In XI, after the court had excluded Gladstein's offer of "Poor's Register of Directors," he said: "I thought when you heard the facts you would, Judge."

In XII, during the cross-examination by the Government of the witness Darr, Gladstein made persistent arguments and objections, and after the court had overruled them and instructed the witness to answer questions and not make a speech, as he had done, objected "to the Court's gratuitous and improper characterization of the witness' testimony, as an effort to make a speech * * * ".

In XIII, he persisted in arguing in support of questions which had been ruled out by the court, and, after directions by the latter to desist, said: "They do represent the truth and I intend to show that they do."

In XVIII, Gladstein argued in the presence of the jury that the court should tell them that the witness Nicodemus, whose credibility was being attacked by the defense, was guilty because he had had to pay costs, although the court had held that the payment of costs did not affect a final judgment that Nicodemus was not guilty.

In XX, he offensively charged the judge with sustaining anticipated objections to his questions before the objections were stated. It was in effect a charge of bias.

In XXIII, he again charged the court with impropriety and partiality.

In XXIV, he persisted in argument, though it had been forbidden.

In XXVI, when the court again stated that it did not desire to hear arguments unless it requested them, he said that "the Court is now making it plain that it no longer wishes to hear evidence from the defendants, and that began to be true when the defense began to put in its case."

In XXVII, when there was disorder in the courtroom upon the sentencing of Gates for refusal to answer questions as directed, the judge suggested that it would be "prudent if the defendants resumed their seats." But Gladstein proceeded to argue that Gates had the right to disobey the court's direction because of immunity under the Fifth Amendment to the Constitution.

In XXXI, during the cross-examination by the Government of the witness Yolanda Hall, Isserman, Gladstein, Dennis, and Sacher in succession interrupted, argued, and made vexatious objections. When the judge tried to curb them, they moved for

a mistrial, and claimed the court was prejudiced.

In XXXII, during the direct examination of Geraldyne Lightfoot by Isserman, he and Gladstein by obstructive tactics succeeded in preventing her from answering a question by the court. Gladstein charged the court with bullying the witness, and made unreasonable objections in which Dennis finally joined. Gladstein charged the court with "misconduct," and when the Government attorney stated that there had been no badgering of the witness, impertinently remarked that he was "willing, if your Honor will permit, to have a poll taken of the members of the jury and the people of the press and the people in attendance * * *". The acts set forth in XXXII, were clearly outrageous and prevented an orderly trial.

In XXXIV, after the judge ruled on a question put to the defense witness Thompson, Gladstein proceeded to argue against the ruling and charged the judge with partiality on the ground that he had made an inconsistent decision when the government witness Budnenz was being examined.

In XXXV, during the direct examination of the witness Strong, the court sustained an objection to a question by Gladstein and stated that it wanted no argument; whereupon Gladstein, in an improper aside to the jury, said: "Well, that is no secret."

All of these convictions of Gladstein were supported by the facts and should be affirmed.

### Crockett

The following findings, in addition to those of the first specification, were made as to Crockett:

In III, he impertinently charged the judge with favoring the United States Attorney over the attorneys representing the indicted defendants.

In VII, after the judge had warned defendants' counsel that he wished no more argument, Crockett continued the arguments already made by Isserman, McCabe and Sacher, until warned that he was acting in defiance of the court's request.

In XXI, he suggested that the court had improperly obtained knowledge of the Government's evidence, saying: "I don't think it is customary for the Court to show such familiarity * * * with proof that the Government might present."

In XXII, he improperly charged the court with prejudicial rulings and bias.

In XXVII, the disorder in the courtroom accompanying the sentence of Gates and the remand of Winston and Hall was in no way relieved by Crockett, who joined the other attorneys and the indicted defendants in rising in the courtroom, and made no attempt to have his clients Winter and Stachel resume their seats.

In XXIX, in the course of the examination of Gates, he offensively and irrelevantly said in the presence of the jury: "May the record show that this is the fifth day of the witness' imprisonment in jail."

In XXXVII, he persisted in objections in spite of the previous rulings of the judge and warnings that argument was not desired.

In XXXVIII, he obstructed the trial by continuing argument and charging the judge with having a mind "closed to any grounds that I might state." He also offensively remarked that the judge's mistake in reading too much of an exhibit to the jury was "seemingly unintentional."

All of these convictions of Crockett are supported by the record and should be affirmed.

### McCabe

The following findings, in addition to those of the first specification, were made as to McCabe:

In VI, after protest by the court at reiterated arguments and discussions of the latter's rulings by Gladstein, Sacher, and McCabe, McCabe made the offensive suggestion that the judge's observation that counsel were trying to provoke him and were wasting time "may very well be addressed to someone outside of this courtroom, * * *".

In VII,—in company with Isserman, Sacher and Crockett—he continued to argue after it was clear the court desired no further argument.

In VIII, he sarcastically remarked that "the way in which this case has been conducted is one which I certainly hoped I would never see in a court of justice."

In IX, he charged the judge with picking 11:20 and 3:20 for statements by the latter that counsel were wasting time because 11:30 and 3:20 were deadlines for the newspapers. Later,[11] when the court warned him about his conduct and said that it would not be dealt with then but would be later, he reiterated that his earlier charge that rulings were made for newspaper deadlines "was accurate."

In XXVII, upon the sentence of Gates and the remand of Winston and Hall, he failed to take any steps to help restore order in the courtroom.

All of these convictions as to McCabe are supported by the record and should be affirmed.

### Isserman

The following findings, in addition to those of the first specification, were made as to Isserman:

In VI, after the judge during the challenge to the jury system had sustained an objection to questions regarding low-rent housing projects and had told Isserman that he did not wish to hear arguments, Isserman, notwithstanding, proceeded to argue in conjunction with Gladstein, Sacher, and McCabe.

In VII, Isserman persisted in argument, and charged the court with misconstruing a statement that he had made and with improperly characterizing his conduct.

In XII, he interjected the sarcastic comment that the membership of the witness Darr in American Youth for Democracy had no more bearing on Darr's credibility than the fact that the judge was "in the Social Register."

In XXVII, he was charged with making no attempt to quell disorder when Gates was sentenced for refusing to answer a question and Winston and Hall were remanded for turbulent conduct. Instead of this, Isserman furthered the futile argument that Gates was entitled to disobey the

order of the court because of his rights under the First and Fifth Amendments.

In XXXI, when the court admonished Isserman not to argue, he objected to the holding of the court that his action was deliberate and moved for a mistrial.

The cross-examination of the witness Yolanda Hall was constantly interrupted by objections and arguments from Isserman, Gladstein, Sacher, and Dennis.

In XXXII, during the examination of the witness Lightfoot by Isserman, the latter said that a question by the court made the defense "impossible," and, with the support of Gladstein, succeeded in blocking the inquiry.

All of these convictions as to Isserman are supported by the record and should be affirmed.

### Dennis

The following findings, in addition to those of the first specification, were made as to Dennis:

In XIX, he persisted in argument contrary to the instructions and warning of the court. In this connection the judge found it necessary to adjourn for five minutes to prevent Dennis from continuing to flout his direction.

In XXII, Dennis charged the court with an "outrageous and arbitrary ruling" because the defendants were not granted an adjournment after the Government had completed its case, and characterized one of the court's rulings as a "mockery of justice" and as a prejudgment of the case. He also made other violent characterizations of the judge's action.

In XXXI, he asked whether "the ruling and remarks of the court are directed to the defendants and counsel as to prejudice our case before the jury?" He further stated that "for all intents and purposes the defendants are deprived of counsel and deprived of what is set forth in the Sixth Amendment to the Constitution."

In XL, he charged the court with an "act of gross discrimination and an affront to the Negro people" because the judge had

---

11. Trial Transcript, p. 6980.

refused to allow Davis to sum up rather than the latter's attorney.[12]

All of the convictions of Dennis are supported by the record and should be affirmed.

It is evident from the specifications in the certificate that the judge was confronted with many contemptuous remarks by the appellants and many obstructive refusals to obey his orders. However, he took no immediate action to punish them for contempt. If he had done so, the result would have been to leave the indicted defendants without effective counsel or with the necessity of choosing new counsel —a procedure involving interminable delay. He therefore abstained from any immediate punishment but again and again warned the appellants that their conduct was improper. Illustrative of such warnings, is his statement to McCabe on June 3: "[Were] it not for the fact that I have determined that this trial shall not be disrupted by such things I should have taken action against you and against each of your colleagues long before this, but I shall not do it. I shall leave that to the proper authorities to take care of in due course, and there it shall rest, but you need be under no misapprehension; I have been quite fully cognizant of your contemptuous conduct and your impudence."[13] Many of the occasions on which he warned them are set forth in the margin.[14]

We now reach the appellants' second objection based on their contention that the judge could only impose summary punishment immediately upon the commission of their acts of contempt. The validity of such an objection was left open in Ex parte Terry, 128 U.S. at page 314, 9 S.Ct. 77, 32 L.Ed. 405, and again in Pendergast v. United States, 317 U.S. 412, 419, 63 S.Ct. 268, 87 L.Ed. 368. The appellants argue on this appeal that the judge could not withhold summary punishment until the end of the long trial, and rely largely on the language of Mr. Justice Holmes in his dissenting opinion in Toledo Newspaper Co. v. United States, 247 U.S. 402, 423, 38 S.Ct. 560, 565, 62 L.Ed. 1186, where he said that to his mind the words of the statute "point only to the present protection of the Court from actual interference, and not to postponed retribution for lack of respect for its dignity * * *". Likewise in his dissenting opinion in Craig v. Hecht, 263 U.S. 255, 280, 44 S.Ct. 103, 107, 68 L.Ed. 293, he said: "It seems to me that the statute on its face plainly limits the jurisdiction of the judge in this class of cases to those where his personal action is necessary in a strict sense in order to enable him to go on with his work." But in these opinions the Justice was only dealing with criticism of the judge outside the court during the pendency of a suit and was saying that such criticism was not within the prohibition of the statute because it was not in the presence of the court or "so near thereto as to obstruct the administration of justice". That view the Supreme Court has sanctioned in Nye v. United States, 313 U.S. 33, 61 S.Ct. 810, 85 L.Ed. 1172. But it has expressly left open the question whether, where a judge has power to punish without notice and hearing a contempt in open court, he must impose sen-

---

12. The reasons for the refusal to allow Davis to sum up are set forth in the opinion of Judge Medina reported at U. S. v. Foster, D.C., 9 F.R.D. 367, 371.

13. Trial Transcript, p. 6980.

14. For warnings addressed to the attorneys as a whole, see, e. g., challenge transcript pp. 2546, 2621, 3433; trial transcript pp. 5443, 5872, 6980 (quoted above), 7275, 11031. Many warnings were also addressed to individual counsel. As to Sacher, see, e. g., challenge transcript pp. 2495, 2621, 2684, 3175, 3420, 3872; trial transcript pp. 2480, 3650, 6532, 7124, 8895, 10766, 11578, 12823, 13338, 13894, 14241. As to Gladstein, see, e. g., challenge transcript pp. 4398, 4560, 4562, 4591; trial transcript pp. 3767, 5443, 6461, 6462, 6838, 11275, 11276, 11819, 13169. As to Crockett, see, e. g., trial transcript pp. 829, 3940, 5161, 6055, 7191, 14223. As to McCabe, see, e. g., challenge transcript pp. 2621, 2625, 4117; trial transcript pp. 422, 6980. As to Isserman, see, e. g., challenge transcript 2546, 2623, 2624, 3289; trial transcript pp. 11031, 11273. As to Dennis, see, e. g., trial transcript pp. 3939, 5827, 6049, 6976.

tence immediately after the contempt is committed. This is the question before us.

Not only did the remarks of Justice Holmes, which we have quoted from 247 U.S. at page 423, 38 S.Ct. 565, and 263 U.S. at page 280, 44 S.Ct. 107, relate to situations that are not before us here, but his statement that the language of the statute points ony to the "present protection of the Court from actual interference" and confines its jurisdiction to cases "where his personal action is necessary * * * to enable him to go on with his work" can hardly be applied literally to every case since no summary punishment can prevent obstructive acts already completed inasmuch as it must follow them. For example, in the Terry case the misconduct was complete and the particular case was over, so that summary punishment was not necessary to enable the court "to go on with" its work, yet it was imposed. The quoted remarks of Justice Holmes were evidently intended to give salutary warning against the unnecessary exercise of the power to punish for contempt and did not contemplate a case like the present, where it would have been necessary either to abandon all attempts to curb disorderly and contemptuous conduct or very seriously to interfere with the progress of the trial. The course adopted by Judge Medina warned the appellants that they were misconducting themselves at their peril. It tended to prevent further obstruction, and also demonstrated that its orders and warnings were not in vain by punishing the offenders, after the verdict was recorded, for flouting its authority. Any other treatment of the contemptuous action would have been self-defeating.

The opinion of Chief Justice Taft in Cooke v. United States, 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767, should be read in the light of the facts of the case before him. When he spoke, 267 U.S. at page 536, 45 S.Ct. at page 395, of "immediate penal vindication of the dignity of the court", we think that he meant as speedy vindication as was practicable under the circumstances, and could not have required steps which would have broken up the trial or frustrated the powers of the judge to vindicate his authority after it had been flouted in open court. Nor do we think that the language of the Supreme Court in In re Oliver, 333 U.S. 257, 274, 68 S.Ct. 499, 92 L.Ed. 682, contemplates the limitation which appellants' counsel contend for. There is no doubt that the power to punish summarily without a hearing should be exercised with great circumspection. We are in no way indicating that a lax, importunate exercise of it ought to be sanctioned. We merely hold that the acts of these appellants were intolerably obstructive to an orderly trial and merited summary punishment, and that the mode of dealing with them adopted by the court was justified under the circumstances.

■ The conclusion we have reached in overruling the appellants' second objection is borne out by a decision of the Ninth Circuit,[15] and by several decisions in the state courts where summary punishment for contempt was imposed under statutes similar to the one governing the case at bar. They are all to the general effect that the punishment should follow the acts of contempt with reasonable promptitude, but that the degree of promptitude depends upon the particular facts of each case, and that the punishment need not follow immediately if such an imposition would endanger the defense in a criminal case, or interfere with its conduct. We cite these decisions in the margin,[16] and in addition quote from the opinion of the Supreme Court of Minnesota[17] which clearly states the reasoning applicable to cases involving the summary disposition of contempts committed in open court:

"Jurisdiction to punish for a direct contempt attaches the instant the contempt is committed, and continues at least so long as may be necessary to afford the court a rea-

15. In re Maury, 205 F. 626.

16. Middlebrook v. State, 43 Conn. 257, 21 Am.Rep. 650; In re Cary, 165 Minn. 203, 206 N.W. 402; In re Willis, 94 Wash. 180, 162 P. 38.

17. In re Cary, supra, 165 Minn. 203, 206 N.W. at page 402.

sonable opportunity to vindicate its authority at a time and under circumstances where its action will have no untoward effect upon the business in which the court was then engaged. A court may, and usually does, impose punishment for a direct contempt at the time the offense is committed, but it does not follow that jurisdiction is lost by waiting for a more fitting or convenient time.

"We know of no law or rule requiring the court to suspend a trial for the purpose of passing judgment on a contemner and making the necessary record thereof. Where a defendant is on trial for a grave crime, it might result in serious prejudice to him if his attorney were to be adjudged guilty of contempt and subjected to punishment therefor in the midst of the trial. While the court may punish a direct contempt instanter, yet, if of opinion that imposing punishment at that time would be unwise, or that prejudice to some of the parties before the court might ensue therefrom, it may defer action in the interest of justice and fairness, and does not lose jurisdiction by doing so.

"Of course the power to punish as for a direct contempt must be exercised promptly, if exercised at all; but the time within which it must be exercised is not well defined, and depends in a large degree upon the facts and circumstances of the particular case. In the present case the power was exercised as soon as the jury had retired and before the verdict was returned; and we are clearly of opinion that jurisdiction to exercise it would continue at least until the trial was fully completed. *Ex parte* Terry, 128 U.S. 289, 9 S.Ct. 77, 32 L.Ed. 405. * * *"

■ The chief defense which appellants make for their obstructive tactics and impudent charges is that the judge provoked them by making what they consider indefensible rulings in the case. The validity of these rulings is not before us on this appeal. But it must be borne in mind that when counsel differ as to the rulings of a judge, they acquire no privilege to charge him with bad faith and misconduct, and to obstruct the trial. Their only remedy is by an appeal.

The order sentencing the appellant Sacher is affirmed except for Specifications I, XV and XVIII, as to which it is reversed. The orders sentencing appellants Gladstein, Crockett, McCabe, Isserman and Dennis are affirmed except for Specification I, as to which they are reversed.

## APPENDIX

### Contempt Certificate

In conformity with Rule 42(a), Federal Rules of Criminal Procedure, I hereby certify that the series of criminal contempts set forth below were committed in the actual presence of the Court and were seen or heard by the Court during the trial of the case of United States of America v. Foster et al., C 128-87, which commenced on January 17, 1949.

By way of preliminary, I may say that I would have overlooked or at most merely reprimanded counsel for conduct which appeared to be the result of the heat of controversy or of that zeal in the defense of a client or in one's own defense which might understandably have caused one to overstep the bound of strict propriety. Before the trial had progressed very far, however, I was reluctantly forced to the conclusion that the acts and statements to which I am about to refer were the result of an agreement between these defendants, deliberately entered into in a cold and calculating manner, to do and say these things for the purpose of: (1) causing such delay and confusion as to make it impossible to go on with the trial; (2) provoking incidents which they intended would result in a mistrial; and (3) impairing my health so that the trial could not continue.

I find that the acts, statements and conduct of each of the defendants, hereinafter specified, constituted a deliberate and wilful attack upon the administration of justice, an attempt to sabotage the functioning of the federal judicial system, and misconduct of so grave a character as to make the mere imposition of fines a futile gesture and a wholly insufficient punishment. To

maintain the dignity of the court and to preserve order in the court room, under these circumstances, was a task of the utmost difficulty. There was, accordingly, no alternative than to give the repeated warnings which from time to time I gave, and to postpone the impositions of the sentence until the close of the case. To have done otherwise would inevitably have broken up the trial and thus served the ends which these defendants tried so had to attain. As isolated quotations from or references to the transcript can give but a partial view of the acts, statements, and conduct above referred to, I hereby make the entire record part of these proceedings.

Accordingly, I adjudge the following guilty of the several criminal contempts described below:

| Defendant | Specifications |
| --- | --- |
| Harry Sacher | I, II, V, VI, VII, VIII, XII, XIV, XV, XVI, XVII, XVIII, XIX, XXV, XXVII, XXVIII, XXIX, XXX, XXXI, XXXIII, XXXVI, XXVII, XXXIX. |
| Richard Gladstein | I, IV, VIII, X, XI, XII, XIII, XVII, XX, XXIII, XXIV, XVIII, XX, XXIII, XXIV, XXXII, XXXIV, XXXV. |
| George W. Crockett, Jr. | I, III, VII, XXI, XXII, XXVII, XXIX, XXXVII, XXXVIII. |
| Louis F. McCabe | I, VI, VII, VIII, IX, XXVII. |
| Abraham J. Isserman | I, VI, VII, XII, XXVII, XXXI, XXXII. |
| Eugene Dennis | I, XIX, XXII, XXXI, XL. |

I.

During the entire trial Messrs. Sacher, Gladstein, Crockett, McCabe, and Isserman, attorneys and counsellors-at-law, and after March 17, 1949, Mr. Dennis, attorney *pro se*, joined in a wilful, deliberate, and concerted effort to delay and obstruct the trial of United States v. Foster et al., C 128-87, for the purpose of causing such disorder and confusion as would prevent a verdict by a jury on the issues raised by the indictment; and for the purpose of bringing the Court and the entire Federal judicial system into general discredit and disrepute, by endeavoring to divert the attention of the Court and jury from the serious charge against their clients of a conspiracy in substance to teach and advocate the overthrow of the Government of the United States by force and violence, by attacking the Presiding Judge and all the Judges of this Court, the jury system in this District, the Department of Justice of the United States, the President of the United States, the police of New York City, and the public press of New York and other cities.

To effect this plan, these defendants in this proceeding, contemptuously and without justification:

a. Disregarded numerous warnings of the Court concerning their wilful delaying tactics, except for ironical references thereto;

b. Suggested that various findings by the Court were made for the purpose of newspaper headlines;

c. Insinuated that there was connivance between the Court and the United States Attorney;

d. Insisted on objecting one after another to rulings of the Court, despite a ruling on the first day of the trial, repeated several times thereafter, that all objections and exceptions would inure to the benefit of each of their clients unless disclaimed;

e. Persisted in making long, repetitious, and unsubstantial arguments, objections, and protests, working in shifts, accompanied by shouting, sneering, and snickering;

f. Urged one another on to badger the Court;

g. Repeatedly made charges against the Court of bias, prejudice, corruption, and partiality;

h. Made a succession of disrespectful, insolent, and sarcastic comments and remarks to the Court;

i. Disregarded repeatedly and flagrantly the orders of the Court not to argue without permission and to desist from further argument or comment;

j. Disregarded rulings on the admissibility of evidence so as to endeavor to place before the jury by leading questions the subject matter excluded;

k. Persisted in asking questions on excluded subject matters, knowing that objections would be sustained, to endeavor to

create a false picture of bias and partiality on the part of the Court;

l. Accused the Court of racial prejudice without any foundation; and

m. Generally conducted themselves in a most provocative manner in an endeavor to call forth some intemperate or undignified response from the Court which could then be relied upon as a demonstration of the Court's unfitness to preside over the trial.

## II.

On January 21, 1949, during the hearing on defendants' challenge to the jury system, Herbert Allen, a member of the petit jury panel for the January Term of Court, was called as the first witness in support of the challenge. During this direct examination by Mr. Gladstein, Mr. Allen was asked for the assessed valuation of his home, to which question an objection was sustained. Thereafter, lengthy argument was directed to the Court by Messrs. Gladstein, McCabe, Isserman and Sacher, which was brought to a conclusion with Mr. Sacher shouting at the Court (Ch.Tr. 1390): "Well, let me make one thing clear; your Honor said that you were going to conduct a hearing, and I tell you now if what you are going to do is to prevent us from asking these questions and proving the fact, then this hearing is no hearing; *it is just a sham and a pretense designed to prevent the establishment of those facts which will prove that the system is precisely what we say it is.*"

## III.

On February 2, 1949, during the challenge to the jury system, Harry Rosten, Research Manager for The New York Times, was being questioned by Mr. Isserman about Challenge Exhibit No. 20, already in evidence. Objection was made to the line of question being conducted by Mr. Isserman, and following argument, the Court sustained the objection. Thereupon Mr. Gladstein and Mr. Sacher further argued the matter. They were followed by Mr. Crockett, who did not argue but limited himself to the insinuation quoted below (Ch.Tr. 2302): "I have only one comment to make, your Honor. I have listened very carefully to the proceedings during the whole time this was going on and what surprises me, frankly, your Honor, is the frequency with which Mr. McGohey will make an objection and the Court will sustain the objection without asking Mr. McGohey to state the reasons for his objection or giving us an opportunity to suggest to the Court the reasons why the objection should be overruled."

## IV

On February 3, 1949, during the challenge to the jury system, defense counsel and the Court engaged in a discussion, in the course of which Mr. Gladstein, in an insolent manner, said (Ch.Tr. 2461): "Now although everybody, one would think, who did not prejudge the matter here—" and, after interruption, continued (Ch.Tr. 2463):

"Mr. Gladstein: Now, before the Court's interruption I was about to point out that what is important here is the question of your Honor's determinations upon the objections Mr. McGohey has raised, and sometimes even without him suggesting it—

"The Court: Yes, maybe I have a right to make a comment from the bench once in a while. It seems probably wrong to you and your colleagues, but it is commonly done, and I have no intention whatever of refraining.

"Mr. Gladstein: I wansn't referring to your Honor's comments, because they are always welcome. I was referring to the rulings that you make adverse to the defendants even before the United States Attorney opens his mouth to make an objection. That has happened."

After further colloquy, during which the Court invited a memorandum from Mr. Gladstein in respect to the admissibility of certain proof, Mr. Gladstein continued his reflection on the Court's integrity, as follows (Ch.Tr. 2466–2467):

"Mr. Gladstein: And it is not an easy task to research the authorities and present them to you on the question of the admissibility of this kind of data which is obtained by sampling methods. But if your Honor, *if there is any possibility of having*

*the effect of those authorities respected* and obtaining a reconsideration of the ruling that your Honor has taken, I will certainly do whatever I can to get that memorandum of law to the Court.

"The Court: I try to respect all authorities, those that are controlling and those that are persuasive. I try to do my duty as a Judge. I do not think it is very nice of you to put in that little insinuation, but I take it in good part. And so we will pass it.

"Mr. Gladstein: Very well. It isn't half of what I felt like saying, your Honor, as a result of what you said.

"The Court: Well, I can well believe that."

## V.

On the same afternoon, after hearing lengthy argument by Mr. Gladstein (Ch.Tr. 2483-2489), the Court sustained a Government objection to certain evidence proffered through the witness Wilkerson. After a recess granted at Mr. Sacher's request, Mr. Crockett and Mr. Sacher argued for a reconsideration of the ruling (Ch.Tr. 2490-2501). Continuing the attack of defense counsel upon the court and completely ignoring the fact that the Court had heard Mr. Gladstein at length before ruling, Mr. Sacher loudly complained (Ch.Tr. 2494): "I repeat, this is an Alice in Wonderland procedure. We always get the sentence first and then the trial. Now, if we would just get back to ordinary procedure with trial first and sentence afterwards, this might be a little bit more real * * *".

The Court directed Mr. Sacher to "completely refrain from further argument along this line" (Ch.Tr. 2494). Notwithstanding the direction of the Court, Mr. Sacher shortly returned to his attack upon the Court, as follows (Ch.Tr. 2500): "Is it because the evidence is becoming too devastating for the Government that we must now be circumscribed? This is the telling stuff. Why are we stopped at this point when we proceed definitely to show that the Republican Party vote is the guide to the determination of how many jurors come from a district, and not that impartial selection which the Constitution and the statute require? That is what is at stake in this instance, your Honor, and I submit I don't want to take any more of your time if we are doing nothing to influence you; I don't want to be like the Yankee in King Arthur's Court * * *".

## VI.

On February 4, 1949, during the challenge to the jury system and in the course of the direct examination of the witness Marcantonio by Mr. Isserman, the witness was asked to state how long certain low-rent housing projects had been in existence. The Court sustained an objection and told Mr. Isserman that it did not wish to hear argument from him. However, Mr. Isserman proceeded to argue and he was joined by Messrs. Gladstein, Sacher and McCabe. Repeatedly, the Court interrupted counsel stating that it did not desire to hear argument. Nevertheless, counsel continued (See Ch.Tr. 2544-2548). The Court then directed counsel to proceed with the interrogation of the witness (Ch.Tr. 2548). In the teeth of the direction, Mr. Gladstein continued (Ch.Tr. 2548-2549), as follows: " * * * since your Honor won't permit me to refer to the authorities, then I refer to a practical suggestion, and that is if instead of consuming time in arguing as to whether or not we have the right to make the simple statement for the record as to what the witness would say if he were permitted to answer the question to which the United States Attorney has objected, and which objection has been sustained—if instead of doing that we were simply allowed to follow the normal, usual routine procedure that takes place even before juries * * *"

Mr. Sacher then commenced speaking and the Court stated that it did not desire to hear him at that time (Ch.Tr. 2549). Despite this, Mr. Sacher continued (Ch. Tr. 2549-2550), as follows:

"But you have characterized my conduct as well as that of trial counsel, and I wish to deny it on the record, and I wish to say that your Honor is aware of the fact that there are 40 or 50 newspapers here, and on the threshold of Congressman Marcantonio's testimony you have taken occasion to say that his testimony is being intro-

duced for the purpose of dragging and delaying the trial; and I say—

"The Court: Did I say that?

"Mr. Sacher: Well, you imply that very broadly. If your Honor wishes to deny it I shall be glad to have the denial. But I got the impression very distinctly that your Honor's observation was made just on the threshold of the Congressman's testimony and that it was designed to color the effect and impression to be given to it, and I do not believe, your Honor, that that is appropriate.

"The Court: If you are only trying to provoke me, Mr. Sacher, you are wasting your time."

Shortly thereafter, Mr. McCabe concluded with the following statement (Ch. Tr. 2554): "Yes, but I say that it seems to me that that is what is in your Honor's mind, and that also may very well be addressed to some one outside of this courtroom, and I think that the record, if reviewed by some other authority may indicate unusual degree of tolerance in the face of particularly annoying tactics, which I don't think we are guilty of."

VII.

On the same day, while the witness Marcantonio was still being examined by Mr. Isserman, the witness was asked if he had found many persons residing in his Congressional District who were known to him to be of average intelligence. The Court sustained an objection. However, Mr. Isserman proceeded to argue the matter. Finally, the Court sought to close argument, directing Mr. Isserman to take his exception (Ch.Tr. 2621). Nevertheless, Mr. Isserman persisted (Ch.Tr. 2621–2622), as follows:

"Mr. Isserman: I was in the middle of my objection when your Honor interrupted to misconstrue a statement that I made. I said, conditionally—

"The Court: I wish you would not say that I do that, to misconstrue.

"Mr. Isserman: It seems to me to have been misconstrued.

"The Court: That seems an impertinent thing. Mr. Isserman, that seems an im-

pertinent thing. You are an experienced lawyer and you know better than to do that. Now, you lawyers have been at that here for three weeks, perhaps to provoke me—I don't know what the reason may be. But I do know that if you keep it up some day, perhaps now, perhaps hereafter, there will be a time of reckoning. Now, please don't do that.

"Mr. Isserman: And I would like now to object to your Honor's characterization of my comment.

"Now, the statement that I was making—

"The Court: Well, when you charge me with deliberately misconstruing something I regard that as impertinence.

"Mr. Isserman: I did not say it was deliberate, your Honor. But I said it seemed to me to be that. But, in any event, what I was saying was this: I said if this were a small community the method of proof, as indicated by the cases, would be to call the persons directly involved. Your Honor has thus far conditionally ruled that your Honor would not allow the calling of those persons who would give the direct evidence on their status."

Mr. Isserman continued his argument and the Court again interrupted to remind Mr. Isserman of the Court's previous direction as follows (Ch.Tr. 2623–2624):

"The Court: Now, Mr. Isserman—

"Mr. Isserman: Now, the reason why—

"The Court: Let me say something to you. In every judicial proceeding that I am familiar with, and I have had a pretty large experience at the bar, when the Court indicated that it didn't want any more argument on a point the lawyer quietly desisted. If he chose to except he noted his exception and went on to something else. Here, perhaps in an endeavor to wear me out, which it is gradually doing, you keep that up, and you make the argument or arguments just as you are doing now. And I say, as I have said before, that that in my judgment is not the proper conduct of an attorney. It is extremely wearing on the Court in a trial of this kind. I suppose it will wind up by bringing me down. I hope it won't. I may have the strength

to go on, and I hope I shall. But I tell you—stop it.

"Mr. Isserman: I would like to take exception to your Honor's remark as an improper characterization of my conduct.

"I would like to state my—complete my objection for the record if I may.

"The Court: You insist on going ahead again, and all I can do, as I do not intend to make a rumpus about it, is to advise you again—please desist; and then, if you insist upon going on, why, you must take the consequences, whatever they may be.

"Mr. Isserman: May I state my objection for the record?

"The Court: You may not."

Instead of proceeding with the interrogation of the witness, Messrs. McCabe, Sacher and Crockett carried on the argument. The Court told Mr. McCabe that argument was unnecessary (Ch. Tr. 2625), and then Mr. Sacher, angrily shouting, offered his "observation" to the Court (Ch. Tr. 2626–2627). Mr. Crockett thereupon took up the argument and failed to desist until the Court warned him that his insistence on going on was in defiance of the Court's direction (Ch. Tr. 2632).

## VIII.

The jury challenge commenced on January 17, 1949. On February 11th the Court determined that counsel for the defendants had taken almost four weeks to put in evidence which could have been adduced in no more than three or four days (Ch. Tr. 3291) and accordingly the Court concluded that defense counsel had engaged in a "deliberate effort here to make a mockery of justice" (Ch. Tr. 3290). At the close of court on that day, the Court directed defense counsel to submit a statement showing what they proposed to prove in the remainder of the challenge and how they proposed to prove it (Ch. Tr. 3344–3345). The statement was submitted on February 14th (Ch. Tr. 3346) and was found insufficient (Ch. Tr. 3415). At this juncture, the Court in the exercise of its discretion as to the order of proof, refused to hear further testimony at that time on behalf of defendants in connection with their chal-

lenge to the jury system, and directed that the Government proceed with its proof. Counsel for defendants vociferously objected and, in the course of argument, Mr. Sacher, in an insolent manner, said (Ch. Tr. 3420): "Now, I must in all candor say, your Honor, that it is very difficult for us among the defense counsel to believe that the United States Attorney was caught unawares in the request or the direction which the Court made to him to proceed with his proof on an hour and half's notice—".

Other counsel proceeded to object, which led the Court to remark that the way the hearing was conducted was such as he never thought he would see in a court of justice (Ch. Tr. 3433). Thereupon, Mr. McCabe in a sarcastic tone said (Ch. Tr. 3433):

"I will agree, your Honor, on that last point; the way this case has been conducted is one which I certainly hoped that I would never see in a court of justice.

"The Court: You mean the way it has been conducted by me, I take it.

"Mr. McCabe: I mean that exactly."

The Court stated (Ch. Tr. 3434): "I have been subjected to every kind of vituperation here and you might just as well tell me how I am going to be reversed and all that. It remains to be seen what will be done by higher courts, and your telling me about that isn't going to affect my judgment. I am trying my best here to rule justly, to rule impartially, to protect the rights of these defendants despite the conduct of their counsel, and I shall continue to do that."

Mr. McCabe followed this with the statement (Ch. Tr. 3434): "I rise simply to say —to except to your Honor's characterization that anything the defendants' attorneys have done is sabotage. Sabotage there has been, but as I say I think it has been a sabotage of the entire system of justice in this court, and I say that we are the only ones who seem to be interested in that."

Thereupon, Mr. Gladstein jumped to his feet and, angrily advancing toward the bench, he said in a truculent manner (Ch. Tr. 3434–3435):

"Well, now may I ask your Honor this: does your Honor really mean that the record shall indicate that it is a protection of the rights of these defendants for your Honor to say when I offer a piece of evidence, 'Mr. Gladstein, that would be material, that would be relevant, that would help to prove your case, but I am not going to let you put it in evidence because I don't like the way you and your colleague lawyers have been behaving?

"The Court: Did I say that?

"Mr. Gladstein: In effect, yes, because you have absolutely rejected and you have prevented me from introducing evidence—".

IX.

On February 18, 1949, during the defendants' challenge to the jury system, Mr. McCabe diverted the course of his argument to remark (Ch. Tr. 4116–4117):

"I would like to say to your Honor that I really have come to believe that the constant repetition by your Honor at intervals which are almost as regular as the tolling of Big Ben—and I mean nothing personal in the allusion—or the eruption of Old Faithful out in Yellowstone Park, or wherever it is—these come at stated periods. I think you can pick 11.20 and 3.20 when these statements come that we are delaying; we are doing nothing; your Honor has seen nothing in the record. I say, I don't want—

"The Court: What is the point of those times, of those particular times?

"Mr. McCabe: 11.30 I think is the deadline for the afternoon papers, your Honor, and I think around 3.20 is the deadline—".

The Court (Ch. Tr. 4117): "Well, that is something I had no idea of, and I must say you have got an ingenious mind to suppose that something was said for such a purpose. I think you ought to be ashamed of yourself." See also Tr. 6980.

X.

On February 28, 1949, during the challenge to the jury system, Mr. Gladstein asked the Court to reconsider its ruling with respect to a document which he had sought to have admitted into evidence. The Court adhered to its prior ruling and stated it did not desire to hear further argument (Ch. Tr. 4559). Mr. Gladstein refused to heed the direction of the Court, as follows (Ch. Tr. 4560–4562):

"Mr. Gladstein: But, your Honor, *upon the pretext that this is a confidential document,* the one that I am asking about, the one that was written by this witness, *you are preventing me from showing* without any question the final proof of the corruption of the system here in so far as they placed in charge of it a man who was the director of a dozen corporations, who—

"The Court: Mr. Gladstein—

"Mr. Gladstein: May I finish, Judge?

"The Court: I consider your language offensive and not fitting for an officer of this court to use when you speak of a ruling by the Court as done under a pretext, and use such other language as you used there. You must know that you are doing something that you should not do, and I direct you to desist.

"Mr. Gladstein: Your Honor, I ask that you consider the law that applies to this question because—

"The Court: I heard what you said.

"Mr. Gladstein: Do you refuse to have a memorandum of law submitted to you?

"The Court: And I consider the language offensive.

"Mr. Gladstein: Do you—

"The Court: And you know, you know that it is, but of course it may be pleasing to some of the people.

"Mr. Gladstein: Well, that is not—I have never said anything—

"The Court: But that is an additional reason why you should not do it.

"Mr. Gladstein: I have never said anything for the purposes of pleasing anyone here but for the purpose of trying to put in evidence and to persuade your Honor to do what I think the law requires.

"The Court: Well, you are not going to provoke me, so you might as well stop doing that.

"Mr. Gladstein: I want to make an offer of proof concerning this letter which, ac-

cording to the witness' statement, is in this building and readily available and which, by the way, Mr. Duncan, it was called for in the subpoena that was served on you—isn't that so?

"The Court: I direct you not to make this one. It is already sufficiently evident in the case what the paper is and what your claims about it are, and mere repetition of it will only serve to use up your time that you can employ to better advantage.

"Mr. Gladstein: All right. Let the record show that it is a letter written in May, 1942 by Mr. Duncan, the present witness, and let the record further show that I called for that letter and for the letter or questionnaire in which it was a response, to which it was a response—

"The Court: Now, Mr. Gladstein, you have again done what I have told you not to do.

"Mr. Gladstein: I want the record to show that I had the subpoena served on this witness. Can it now show that?

"The Court: I understand what you want, but the accumulation of these acts of disobedience to my rulings is something that concerns you, and I hope that you won't keep at it any more."

## XI.

On the same afternoon, shortly after the foregoing incident, Mr. Gladstein offered in evidence the 1949 edition of "Poor's Register of Directors," consisting of 3200 pages. The Court stated that it would hear Mr. Gladstein on the question of the relevancy of the exhibit. After hearing a statement from Mr. Gladstein, the Court sustained the objection to the book. Thereupon Mr. Gladstein, in a sarcastic and impertinent manner, said (Ch. Tr. 4590): "I thought when you heard the facts you would, Judge."

## XII.

On March 1, 1949, in the course of the cross-examination of the witness John Whittier Darr, Jr., the witness was asked by Government counsel how long he had been a member of American Youth for Democracy. Mr. Gladstein objected to the question as incompetent, irrelevant and immaterial. The Court overruled the objection, but Mr. Gladstein continued to argue (Ch. Tr. 4781).

As soon as Mr. Gladstein finished, Mr. Sacher and Mr. Isserman interjected sarcastic comments, as follows (Ch. Tr. 4781):

"Mr. Sacher: May I respectfully say to your Honor that membership in the American Youth for Democracy has no more bearing on the credibility of this witness than the fact that Judge Knox is director of two of the biggest corporations in this country."

"Mr. Isserman: Or that your Honor is in the Social Register."

The Court again stated that it overruled the objection and directed the witness to answer the question and said to the witness he should bear in mind that he should not make a speech as he had done a moment ago. Thereupon Mr. Gladstein said (Ch. Tr. 4782): "Let the record show my objection to the Court's gratuitous and improper characterization of the witness' testimony, as an effort to make a speech—".

## XIII.

On April 4, 1949, in the course of the cross-examination of the witness Budenz, the United States Attorney objected to a line of questioning by Mr. Gladstein, who was directed by the Court to turn to something else (Tr. 2296). Mr. Gladstein persisted in arguing the matter with the Court. The Court again directed Mr. Gladstein to turn to another subject and told him that when a lawyer persists in arguing about the same thing the only inference is that the lawyer is trying to leave the impression that the facts recited in questions asked by the lawyer and ruled out actually represent the truth. Mr. Gladstein thereupon made the following statement in the presence of the jury (Tr. 2297): "They do represent the truth and I intend to show that they do. Let me put it this way—"

## XIV.

On April 5, 1949, during the cross-examination of the witness Louis F. Budenz, the following transpired (Tr. 2479-2480):

"Q. Can't you say certainly whether it was in August or not?

"Mr. McGohey: I object.

"The Court: Overruled.

"It is puzzling me as to what difference it made as to what date he made the speech but—

"Mr. Sacher: When this witness undertakes—

"The Court: Please don't argue. I allow the question.

"Mr. Sacher: When your Honor makes a provocative remark and your Honor says you don't know what difference it makes—

"The Court: I strike out your remark about may making a provocative remark. I did not make a provocative remark and I consider your response insolent. Now you please stop that. I am not in the habit of making provocative remarks. I am trying to do my best to administer justice.

"Mr. Sacher: And I am trying to defend my clients.

"The Court: I will not have insolence from the bar.

"Mr. Sacher: I am trying to do my best to defend my clients.

"The Court: You please refrain from further comment and frame your next question. I am used to having respect from the bar.

"Mr. Sacher: I wish to say to your Honor that I don't want to show you any disrespect.

"The Court: You reframe your question.

"Mr. Sacher: And you know it.

"The Court: Oh, yes, I know it. I sure do.

"Mr. Sacher: And I think it is a reciprocal objection. I think lawyers who are defending their clients for their liberty should not be treated as though they were dogs in the courtroom either.

"The Court: That is an insolent remark and I strike it out, the statement that you have been treated like a dog. I don't see how you dare speak that way.

"If you can control yourself, please ask the next question.

"Mr. Sacher: I am trying, your Honor."

## XV.

During a session of the court on April 7, 1949, while a Government witness was under direct examination, Government counsel invited the Court's attention to the fact that a Mr. Simon Gerson, who regularly had been seated at defense counsel's table, was circulating certain papers to representatives of the press in the courtroom, whereupon the following colloquy took place (Tr. 2750-2751):

"Mr. Gordon: I see Mr. Gerson passing out some papers to the press section, your Honor.

"Mr. Sacher: Now that is absolutely wrong, your Honor. I asked Mr. Gerson to be good enough to speak to someone for me. This is another instance of surveillance.

"The Court: Well, if Mr. Gerson is passing out press releases in the courtroom, please stop it.

"Mr. Sacher: Well, there are no press releases.

"The Court: All right. Then that settles it, that is the end of it.

"Mr. Sacher: But it is uncomfortable, your Honor, to be under observation. Can't we move freely in the courtroom without having our movements remarked upon?

"The Court: Well, if you haven't been moving freely in the courtroom, Mr. Sacher, then my eyes and ears have been deceiving me. (Mr. Gordon hands paper to the Court.)

"The Court: Now let us see what this paper is that Mr. Gordon produces. (After examining) Why, it is a press release—doing just what you said was not being done.

"Mr. Sacher: I asked Mr. Gordon—Mr. Gerson to see someone for me on the outside, and it had nothing to do with press releases, your Honor.

"The Court: Well, I have in my hand a press release which it appears was just handed out by him and which you deny.

"Now I don't want to get into any collateral controversies here and we will just let it rest with this direction: I do not want any press releases handed around here in the courtroom or anything of that kind.

Now this isn't a propaganda place here. This is a court of justice where people are in trial and I direct that no more of that be done."

The press release which was retained by the Court bears the pictures of the defendants and was captioned as follows:

"Trial of the Twelve
401 Broadway—Room 1601-02-
New York 13, N.Y.—
Walker 5-2010
    Public Relations Office
        For Release
        April 7, 1949"

The records of the Clerk of the Court reflect that on January 17, 1949, Messrs. Sacher, Gladstein, Isserman, Crockett and McCabe notified the Clerk that for all purposes relating to any matter in the trial the address of each is 401 Broadway, Room 1602, New York 13, New York, and that the office telephone number is WAlker 5-2010, the same address and telephone number which appeared on the press release referred to above.

### XVI.

On April 19, 1949, in the course of the direct examination of the witness Charles Nicodemus, Mr. Gladstein objected to a question which had not yet been completed, whereupon the following transpired (Tr. 3649-3650):

"The Court: Well, it seems to me, Mr. Gordon, there is something in that. Why don't you ask him a question without covering the matter of the other testimony? Is there something you want to direct his attention to?

"Mr. Gordon: Yes, I want to ask him whether he had received any instructions.

"Mr. Sacher: I object to this, your Honor, because it is quite obvious—

"Mr. Gordon: Why does Mr. Sacher shout me down?

"Mr. Sacher: Oh, Mr. Sacher shouting this little boy down.

"The Court: Now, Mr. Sacher, you are getting back into your old form.

"Mr. Sacher: Your Honor, I have consistently been in this form and no observations from the bench will change that form.

"The Court: You never can tell what will happen.

"Mr. Sacher: With you Honor up there I suppose that is true.

"The Court: I might possibly get control of my courtroom. I think I shall."

### XVII.

On April 22, 1949, in the course of the direct examination of the witness Charles Nicodemus, the Court sustained an objection made by Mr. Gladstein to a question asked by Government counsel. Mr. Sacher then arose and asked the Court to admonish Government counsel not to ask questions which were leading. The Court pointed out that the objection had been sustained. Notwithstanding that Mr. Sacher already had stated the ground for his motion, Mr. Sacher then asked the Court whether he could say why he wanted the Court to rebuke Government counsel, but the Court refused permission. Mr. Sacher then remarked in a sarcastic manner (Tr. 3680): "I see, only Mr. Gordon and Mr. Nicodemus may speak."

### XVIII.

On April 22, 1949, during the cross-examination of the witness Charles Nicodemus, Mr. Sacher asked the witness if he had pleaded guilty to an indictment for carrying concealed weapons. The Court, expressly stating that it understood that counsel was bringing out a conviction of crime, permitted him to proceed with the examination on this subject. Mr. Sacher then knew, on the basis of the entries reflected on the certified copies of the judgments in his possession, that the witness had been found not guilty on two separate charges, but he did not disclose those facts to the Court. Instead, he continued the cross-examination on this subject, knowing that the Court was permitting the line of examination on the theory that evidence concerning convictions for crime was being elicited. When Government counsel were permitted to examine the judgments and

sought to inform the Court of the fact that the witness had been found not guilty, Mr. Sacher exerted every effort to prevent the disclosure of these facts to the Court (Tr. 3716-3723).

In the course of redirect examination of the witness the Court reiterated that the judgments disclosed that the witness had been found not guilty (Tr. 3765-3766), whereupon the following occurred (Tr. 3767):

"Mr. Gladstein: And also, in connection with your Honor's statements that you will continue to tell the jury that the case in which Mr. Nicodemus was involved turned out as not guilty, would you be good enough to add, if you tell the jury that, that it was no doubt because Mr. Nicodemus was innocent that the Court imposed a sentence of $140?

"The Court: You see, Mr. Gladstein, it is the first experience I have ever had either at the bar or at the bench where counsel were so brazen, where again and again they argued over the Judge's shoulder to the jury in what seems to be a deliberate attempt to induce the jury or some member thereof to disregard the Court's instructions. I have heretofore had occasion to tell counsel that that is treading on dangerous ground, and I hope it will not be repeated."

## XIX.

On April 25, 1949, in the course of the cross-examination of the witness Garfield Herron by Mr. Gladstein, he offered a book in evidence, to which objection was made by the Government. After argument, the Court ruled that it would not admit the entire book, but, if there were some portion of it that was relevant, the Court would allow that portion in evidence (Tr. 3928-3932). At this point Mr. Sacher arose and argued that it was necessary to have the book in its entirety in evidence, and he continued the argument until the Court directed him to desist (Tr. 3936). Immediately, Mr. Dennis arose and the Court stated to him that it did not desire any further argument, saying that further talk would not be for the purpose of persuading the Court in connection

with his ruling, but for other purposes (Tr. 3937). Mr. Sacher thereupon arose and objected to the statement. The Court interrupted him, saying that he was not going to have the trial carried on for propaganda purposes. Mr. Sacher thereupon stated (Tr. 3937): "I object to that. That is what the prosecution is doing. We are trying to prove the truth here and we are being stopped from proving the truth. That is what is happening."

Following this, Mr. Dennis arose and stated he would like to make a brief observation. The Court again stated that it did not desire to hear further argument (Tr. 3937-3938). Nevertheless, Mr. Dennis commenced to make a statement. The Court interrupted, asking Mr. Dennis if he realized the Court had directed counsel not to argue (Tr. 3938). Despite this, Mr. Dennis continued, and the following occurred (Tr. 3938-3940):

"Defendant Dennis: I would like to make one brief observation, your Honor, because this is not a small question. I would like to remind the Court that we eleven defendants are not charged—

"The Court: You realize I told you not to do this, don't you?

"Mr. Dennis: I understood I might make a brief observation.

"The Court: But you want to go on just the same. Now I don't think you are helping yourself by doing that, but that is your lookout.

"Defendant Dennis: I would, briefly, like to place the following cardinal question. We eleven defendants are not charged, as your Honor intimated, charged with conspiring directly or indirectly with attempting to or take any steps to overthrow our Government by force and violence. We are charged with an alleged conspiracy to organize the Communist Party, which the prosecution claims would advocate and teach the necessity and the duty to overthrow the U. S. Government by force and violence, and that is to say we are charged with exercising our inalienable rights of free speech, free press and free assemblage, and—

The Court: I suppose you are just daring me to do something to you now but I am not going to do it.

"You gentlemen may be just as disorderly, just as disobedient, just as disrespectful as you choose to be, and you will not goad me into doing something which may prove only a source of difficulty in the trial.

"Now I tell you again to stop."

Following the statement of the Court, Mr. Crockett arose and made an objection, and Mr. Dennis, who had remained on his feet, continued his statement, saying (Tr. 3840): "And the final remark, your Honor, is that we defendants intend, as we are duty-bound to do, to show really what we have advocated, what—".

At this point the Court found it necessary to take an adjournment for five minutes to prevent Mr. Dennis from continuing to flout its direction.

XX.

On May 2, 1949, in the course of the cross-examination of the witness Angela Calomiris, the following transpired (Tr. 4471-4472):

"Q. Now you have said that in the 1947 course the first one of the subjects on which you studied at that course was capitalism and the class struggle, involving the nature of capitalism.

"Mr. Wallace: Objection.

"The Court: Sustained.

"Mr. Gladstein: That is preliminary to a question. I haven't asked a question yet, your Honor.

"The Court: All right.

"Mr. Gladstein: It gets so that even before I ask a question it is sustained, the objection to it.

"The Court: Now that I consider a distinct impertinence—

"Mr. Gladstein: I did not ask a question.

"The Court:—and just an accumulation of what you have been doing here. You say it gets so that the Court rules before you have asked a question, you intimate that I am so prejudiced here that I don't want to be fair and am not fair. Now you will please stop that. You are not helping yourself or your clients by doing it, I think."

XXI.

On May 4, 1949, in the course of the direct examination of the witness Thomas Younglove, the Government offered an educational outline in evidence. This was near the close of the day's session and Mr. Sacher requested a recess to afford defense counsel an opportunity to examine the exhibit. The Court asked if it would not be practical to go to some other subject, or if there were not some books which the witness would be called upon to identify. When Government counsel replied that he could not proceed to another subject, but that there were books that were to be identified, Mr. Sacher observed that if the validity of the introduction of any of the books depended upon the introduction of the proffered exhibit he would feel bound to raise an objection.

The Court then stated that if certain books were to be identified it could see no harm that could come to the defense. Thereupon Mr. Crockett arose and objected to the Court's anticipation of the nature of additional proof that the Government might offer. Although the books mentioned by the Court were "Foundations of Leninism" and the "History of the Communist Party of the Soviet Union," both of which had been previously admitted into evidence and identified by numerous witnesses, he suggested that the Court was improperly familiar with the Government's evidence before it was adduced, as follows (Tr. 4826): "I don't think it is customary for the Court to show such familiarity with the possible course—with proof that the Government might present. That is the gist of it."

XXII.

On May 19, 1949, shortly after the luncheon recess, the Government rested its case and the Court set aside the balance of the day for the hearing of any motions the defense desired to make.

Instead of making their motions, defense counsel lengthily argued for an adjourn-

ment. During the argument, the following occurred (Tr. 6046-6048):

"Defendant Dennis: I rise, first of all, your Honor, to protest most vigorously against the outrageous and arbitrary ruling which you have just made.

"The Court: Which ruling is that?

"Defendant Dennis: The ruling in respect to denying the defense even a reasonable opportunity to present it motions and the grounds for the motions.

"The Court: You see, you are not familiar with these legal matters, Mr. Dennis.

"Defendant Dennis: I am familiar, your Honor, with a number of things on which I would like to speak very briefly.

"The Court: Well, go ahead. This is your time.

"Defendant Dennis: I must say, the first thing that must be noted in respect to directing counsel to conclude any arguments or proffer any motions by 4:30 this afternoon makes a mockery of justice, because by this ruling and by the injunction that defense must produce its first witness by tomorrow morning, your Honor has stated, in effect, that irrespective of what motions we offer that you cannot be convinced that there is no prima facie case.

"The Court: Let me ask you a question—

"Defendant Dennis: And, moreover, that you have prejudged this case.

"The Court: Let me ask you a question: Do you conceive it possible that the proof in support of a given charge might be so clear that argument of its legal insufficiency might not be helpful? Does that strike you as possible as a theoretical concept?"

Subsequently the Court asked Mr. Dennis what, in his opinion, was lacking in the proof adduced by the Government necessary to sustain a charge. To this Mr. Dennis replied (Tr. 6050): "Your Honor, in respect to that the first thing I would say is that we in the United States should never permit what is being perpetrated here, where you have a federal police interpretation of what we defendants think and believe in."

Thereafter, in the course of his argument, Mr. Dennis made the following comment (Tr. 6053–6054): "And it is highly reminiscent in many respects of the Reichstag fire trial and of the efforts of reactionaries in this and other countries to outlaw the Communist Party as a prelude to trying to drag our nation along the path of war and fascism. And however much you may think or agree or disagree with this I would strongly urge as a matter of most elementary justice and not to deprive the defense of some of the remnants of due process of law that we should be afforded an opportunity of a few days at least to prepare our motions, our argumentation."

Following this last statement, Mr. Crockett arose and the following occurred (Tr. 6054):

"Mr. Crockett: If the Court please—

"The Court: Yes, Mr. Crockett.

"Mr. Crockett:—I assume perhaps correctly that it would be to no avail to ask the Court to grant a reasonable time to prepare—

"The Court: It would be without avail to ask me to give any time for the making of these motions. They are to be made this afternoon.

"Mr. Crockett: That is why I made the assumption.

"The Court: Well, you put that word 'reasonable' in there. I don't (think) the request for any time now is reasonable. That is why I denied the application.

"Mr. Crockett: I think, your Honor, that the defendants, as well as myself, and other counsel began this trial with certain illusions that have been shattered because of the prejudicial actions of the Court."

When the Court suggested that Mr. Crockett should be more temperate, the following occurred (Tr. 6055):

"Mr. Crockett: I suggest that this latest ruling of the Court merely confirms all of the prejudicial rulings that have been made in the course of this trial. I suggest that during the course of this trial it has actually been possible and I have heard spectators making the Court's rulings before the Court himself made the ruling.

"The Court: It is very interesting.

"Mr. Crockett: Because the Court's bias was so obvious that it was possible—

"The Court: It is very interesting.

"Mr. Crockett: Because the Court's bias was so obvious that it was possible—

"The Court: That is an insulting comment you are making, Mr. Crockett, a very insulting comment."

## XXIII.

On May 24, 1949, during the direct examination of the witness John Gates, which was conducted by Mr. Sacher, the Court sustained an objection made by the United States Attorney to a question asked of the witness, inquiring whether he ever had to pay the fine or serve the sentence imposed in connection with the witness' conviction on a certain charge. The Court cut off an attempted argument by Mr. Sacher in opposition to the ruling with the direction that it did not desire argument on the matter. Thereupon, Mr. Gladstein interjected a statement which (1) wilfully misstated the evidence by referring to the "conviction" of the witness Nicodemus in the presence of the jury when, in fact, he knew that Nicodemus had been found not guilty and that the Court had so ruled; (2) improperly characterized the Court's correction of the injustice to the witness Nicodemus; and (3) insinuated that the Court was guilty of impropriety and partiality in sustaining the objection. The incident was as follows (Tr. 6271–6272):

"Mr. Gladstein: May I interrupt, your Honor, to object to the Court's ruling that prevents the establishment by testimony of the ultimate outcome of this matter, and I submit that a strange contrast is afforded by the Court's insistence, for example, to which we have no objection—but the Court's over-insistence on pursuing to its final conclusion the arrest and conviction of the witness Nicodemus, concerning which it would seem to me—

"The Court: You will please desist from further argument, Mr. Gladstein.

"Mr. Gladstein: Very well."

## XXIV.

On May 25, 1949, in the course of the direct examination of the witness John Gates, which was being conducted by Mr.

Sacher, an article written by the witness in 1938 was offered in evidence. Objection was made by the United States Attorney, which objection was sustained by the Court. Thereupon the following occurred (Tr. 6460–6462):

"Mr. Gladstein: Your Honor, may I ask that the Government be required to state the grounds for its objection to a document that this man wrote twelve years ago before he ever knew that there would be an indictment and when he expressed his political views on the very issues involved in this case? May I know what the legal ground is by which a man is prevented from showing his intentions, his state of mind—

"The Court: You remember my instruction about these arguments?

"Mr. Gladstein: I desire to ask the Court to require the Government to explode this mystery whereby with the mere words 'I object' they can shut off the right of a man to show—

"The Court: You may think that this matter of argument is helpful. It is certainly not helpful to me. Now you have requested, and you could have requested without those comments and that argument that the Government be required to state the grounds of its objection. That application is denied.

"Mr. Gladstein: Your Honor, we have been sitting here for months—

"The Court: Now please don't start this argument over again.

"Mr. Gladstein: May I—

"The Court: I have no desire to hear it. If you have some motion, make it. If you have some objection, state it and I will rule on it.

"Mr. Gladstein: Well, I do object to a ruling which prevents a man from summoning to his defense the deeds and the acts of his life committed long before there was any question about it—

"The Court: I do not really think, Mr. Gladstein, you have any right to proceed with that form of argumentative matter when I have forbidden it. Now you have already got a very substantial record of

disobedience here. You may have an additional record now if you choose to go on.

"Mr. Gladstein: I have no desire to disobey the Court's admonitions.

"The Court: But you have.

"Mr. Gladstein: I do have a desire, your Honor, to bring before the jury the opening pages of the book—

"The Court: Well, I think, Mr. Gladstein, this sort of argument is the very sort of thing that you are not entitled to bring before the jury and I forbid it.

"Now as I said before, if you choose to pile up the record of these things against yourself, you may go on.

"Mr. Gladstein: I take exception to the Court's remarks.

"The Court: Otherwise you will sit down.

"Mr. Gladstein: I take exception to the Court's remarks.

"The Court: Very well."

### XXV.

On May 26, 1949, in the course of direct examination of the defendant John Gates by Mr. Sacher, objection was made to a question asked of the witness, and was sustained. Mr. Sacher then asked the Court for the theory upon which the objection was sustained. The Court replied that it did not desire argument. Mr. Gladstein arose and asked the Court to inquire of the United States Attorney as to what legal grounds the United States Attorney urged in support of his objection. The Court refused to do this. Mr. Sacher then put another question to the witness, to which objection was made and sustained. Mr. Sacher angrily stated (Tr. 6532):

"I don't think there is a soul in this courtroom who knows what the words 'Past sins must be paid for now' means unless this witness is permitted to say what he was talking about.

"The Court: Now—

"Mr. Sacher: And what is the use of laying it before the jury?

"The Court:—you realize that your action now is deliberately contemptuous?

"Mr. Sacher: It is not deliberately contemptuous. I am just bewildered, your Honor.

"The Court: I have told you not to argue these matters and I really am quite at a loss to understand why you flagrantly and deliberately and persistently disobey my instruction. Probably it is because I don't shout at you, but I don't like to do that."

### XXVI.

On June 2, 1949, in the course of the direct examination of the witness John Gates, which was being conducted by Mr. Sacher, a pamphlet written by William Z. Foster was offered in evidence and objection by the United States Attorney was sustained by the Court. Thereupon, Mr. Gladstein moved that the Court strike out testimony of all Government witnesses dealing with the claim that the Communist Party or its members taught and advocated that force and violence should be used in the event that the United States became involved in a war. This motion was denied by the Court, but Mr. Gladstein continued his argument. The following then occurred (Tr. 6838):

"The Court: You know, Mr. Gladstein, that I have indicated my desire not to hear arguments unless I desire them.

"Mr. Gladstein: I do, your Honor, but I thought that that was limited simply to hearing argument. Now it seems to me, and I submit, that the Court is now making it plain that it no longer wishes to hear evidence from the defendants, and that began to be true when the defense began to put in its case."

### XXVII.

On June 3, 1949, in the course of the cross-examination of the defendant John Gates, he refused to answer a question after being directed to do so by the Court, and he was sentenced for contempt. Immediately upon the pronouncement of the judgment for contempt, Messrs. Gladstein, Sacher, Crockett, Isserman and McCabe, and the remaining ten defendants, simultaneously arose in the courtroom. The defendant Henry Winston and the defendant Gus Hall, each taking several steps past

the end of the counsel table and toward the bench, began in a disorderly and threatening manner to shout at the Court in loud, angry voices. They were adjudged guilty of contempt for their misconduct.

The situation at that time became so serious that it was necessary to send for additional Deputies Marshal, who were then in other courtrooms in the building, to assist in restoring order and to prevent any further incidents in the courtroom.

The Court suggested to Mr. Gladstein that it would be "prudent if the defendants resumed their seats." Mr. Gladstein rejected the Court's request, saying (Tr. 6975), "Well, your Honor, may I first have a ruling on the right of the witness to complete the record of his invocation of his rights under the Fifth Amendment," and continuing to argue thereafter. Mr. Gladstein did not instruct his clients or any of their codefendants to take their seats, and the defendants gave no heed to the Court's direction. Messrs. Sacher and Isserman also made statements to the Court, but neither of them made any attempt to assist the Court in restoring order in the courtroom, nor did Messrs. Crockett and McCabe. After the defendant Dennis had made statements to the Court, he turned to his codefendants and stated that he urged "upon my co-defendants that they at this time do not speak—they can act as they see fit. I urge them not to call for any provocation" (Tr. 6977). Only then did the ten co-defendants resume their seats in the courtroom and order was restored.

## XXVIII.

On June 7, 1949, Mr. Sacher objected to a question asked by the United States Attorney during the cross-examination of the defendant John Gates. Despite the fact that the Court had frequently in the past directed counsel not to argue without leave, Mr. Sacher commenced arguing, saying (Tr. 7123): "I should like to observe that the defendant is being tried—". The Court interrupted him with the suggestion that he desist. Nevertheless, Mr. Sacher in a loud voice commenced to shout (Tr. 7123): "Well, your Honor, I submit that—". When the Court directed Mr.

Sacher to stop shouting, Mr. Sacher said (Tr. 7123): "I am not shouting and I resent the filling of the record with statements about my shouting when all I am doing is speaking vigorously, and that, I think, is part of the function of an advocate."

The Court commented that Mr. Sacher was one of the most vigorous speakers it had ever heard. Mr. Sacher continued to argue, saying (Tr. 7123-7124): "That may be, but I say to your Honor that I resent this trying the defendant for things that came 15 years or 18 years ago and I submit that what he is being tried for is what is charged in the indictment between the years April 1, 1945 and July 20, 1948, and I also wish to say to your Honor that I don't think—".

He finally subsided, but only when the Court advised him that he was proceeding in direct and wilful disobedience of the direction of the Court.

## XXIX.

On June 9, 1949, the defendant John Gates was asked on cross-examination whether he had ever been convicted of a crime. He commenced to shout, saying (Tr. 7363): "I am not making a long explanation. Let me answer. I did testify on direct examination—why don't you read the transcript? This is repetitious. I testified on the direct examination as to what I was convicted of, and Mr. McGohey knows it very well—".

The United States Attorney then requested that the record show that the witness had been shouting when he made the last answer. Thereupon Mr. Sacher stated (Tr. 7364): "May the record show that the witness is being crucified unnecessarily with interrogations to which he has truthfully answered already."

When the Court directed that this remark of Mr. Sacher be stricken, Mr. Crockett arose and, in the presence of the jury, said (Tr. 7364): "May the record show that this is the fifth day of the witness' imprisonment in jail." The Court remarked that it would not be provoked into an answer the Court might later regret. Mr. Sacher then stat-

ed (Tr. 7364): "I object to that. We are the ones who are being injured and we are not being permitted to complain of the injury that is being inflicted on us. I think in the present state of the record, your Honor, it ill becomes anybody here to claim any martyrdom."

### XXX.

On June 30, 1949, in the course of the cross-examination of the defendant Gilbert Green by the United States Attorney, he was interrogated concerning a series of false statements in an application which he had prepared. When pressed for an answer concerning one of the false statements, the witness became evasive. An objection by Mr. Isserman was overruled. Mr. Sacher, who did not represent the witness and who was not participating in the examination of him, arose and interjected, as an attempted diversion (Tr. 8895): "I would like to quote the Court and say 'This is pretty small pickings'."

### XXXI.

On August 1, 1949, the witness Yolanda Hall, called by the defense, was asked a question on cross-examination and then the following transpired (Tr. 11,031):

"Mr. Isserman: I object to that as argumentative. It is not based on the facts in evidence as testified by this witness.

"The Court: Mr. Isserman, do you remember my admonition, that when counsel objects, counsel is merely to state 'I object'? You have violated it several times this morning. Did you forget?

"Mr. Isserman: I am reminded of it now. It is a habit that goes back over 25 years. It is hard to give up that habit, which your Honor has undoubtedly engaged in yourself.

"The Court: Every time you do that your action is contemptuous and direct, I think, wilful and deliberate disobedience of my command.

"Mr. Isserman: I must object to your Honor's characterization of my conduct.

"The Court: I have heard counsel for the defense here again and again give various excuses, say they have forgotten or it was inadvertent, and I have warned them again and again. I now say that such conduct must be and I find it to be wilfully and deliberately done and contemptuous.

"Mr. Isserman: I must object to your Honor's finding.

"The Court: Very well."

Not much later, during the cross-examination of the same witness, at the same session of the court, she refused to answer a question (Tr. 11,070). At this juncture the following occurred (Tr. 11,071-11,073):

"The Court: Do you remember the oath you took when you were sworn as a witness?

"Mr. Isserman: I object to that question.

"The Witness: Yes.

"The Court: Overruled.

"Q. Now, before you—

"Mr. Gladstein: May I object to the Court's—the inference from the Court's statement?

"The Court: Your objection is noted. It is overruled.

"Mr. Gladstein: Because the Court's statement has nothing to do with that.

"The Court: I will hear no argument.

"Mr. Gladstein: I want to note my objection on the record.

"The Court: You have noted it. Sit down.

"Mr. Gladstein: I object to that and ask your Honor to admonish the jury—

"The Court: Will you sit down or must I call an officer to put you down? I will have no more interruptions on cross-examination. Your field day is over.

"Mr. Gladstein: I resent your Honor's remarks as—

"The Court: Mr. Marshal, will you please—all right, I see you sat down by yourself.

"Mr. Isserman: May I object to your Honor's remarks and ask for a mistrial on the basis of your Honor's remarks?

"The Court: Denied.

"Defendant Dennis: Your Honor—

"The Court: I want no argument, Mr. Dennis.

"Defendant Dennis: May I make an inquiry of the Court?

"The Court: you may.

"Defendant Dennis: I would like to know whether the ruling and remarks of the Court are directed to the defendants and counsel as to prejudice our case before the jury?

"The Court: They are not. I have heard enough from Mr. Gladstein. I have heard enough interruptions and suggestions to witnesses and so on, and I will have no more interruptions of cross-examination. Now, that is final and that is over for this trial.

"Mr. Sacher: I wish to object to your Honor's remarks as being wholly improper and unjustified and designed to prejudice the jury against the defendants.

"The Court: Your motion is denied.

"Defendant Dennis: I just wish to state and very emphatically, your Honor, that for all intents and purposes the defendants are deprived of counsel and deprived of what is set forth in the Sixth Amendment to the Constitution."

XXXII.

On August 3, 1949, during the direct examination of the witness Geraldyne Lightfoot by Isserman, she was asked a question to which the Government objected. The Court undertook to elicit the information sought by a direct question. In order to forestall an answer, Messrs. Isserman and Gladstein provoked a disorderly disturbance and succeeded in preventing an answer to the question, as follows (Tr. 11,269-11,274):

"The Court: Mrs. Lightfoot, in this matter of the strategy of the workers, did you discuss the dictatorship of the proletariat, imperialism, and just and unjust wars, and things of that kind, or were they not mentioned?

"Mr. Isserman: I object to the question.

"The Court: Overruled.

"The Witness: Under topic 3—under topic C—

"The Court: You will answer that question yes or no or state that you cannot answer it.

"Mr. Gladstein: I object to the Court's tone and manner of badgering the witness.

"The Court: There is nothing about my tone, and you will please sit down.

"Mr. Gladstein: I desire to make an objection.

"The Court: Mr. Marshal, will you just —(To the reporter) Read the question to the witness.

"We will have no more monkey business here.

"Mr. Gladstein: I object to the ruling.

"Mr. Isserman: I object to the Court's remark.

"The Court: You will sit down, Mr. Gladstein.

"Mr. Isserman: And I want to register an objection to the Court's ruling.

"The Court: Very well.

"Mr. Isserman: As prejudicial to the conduct of the case and to the defense and making the defense impossible.

"The Court: When I desire to ask a question, I am going to ask it. I am through with the interference of counsel.

"Now go ahead and read the question, Mr. Reporter.

"Mr. Isserman: May I ask the Court a question?

"The Court: You may not. (Question read.)

"Mr. Isserman: I object to that question.

"The Court: Overruled.

"A. Under C I discussed—

"The Court: Mrs. Lightfoot, did you hear me tell you to answer that question, either that you did discuss those subjects or that you did not discuss those subjects? Now, which was it? You did discuss them or you did not discuss them?

"Mr. Isserman: I object to that question.

"The Court: Overruled.

"Mr. Gladstein: Your Honor—

"The Court: Overruled. I don't want to hear anything from you, Mr. Gladstein.

"The Witness: The way that the question was—I heard the question. It says—

"The Court: Then you will answer it the way I tell you to, Mrs. Lightfoot. Now, did you discuss those subjects or did you not?

"The Witness: The question includes 'things of that kind,' and—

"The Court: Then I will take out 'things of that kind.'

"Did you—

"The Witness: May I hear the question?

"The Court: I will give it over again.

"Did you in that lecture discuss, when treating the subject of the Strategy of the Workers, the Dictatorship of the Proletariat, Imperialism, Just and Unjust Wars, or any of them?

"The Witness: Well, were they mentioned during the course of that discussion, is that what you are asking me?

"The Court: Well, I suppose that word 'discuss' has some peculiar meaning in the Communist Party—

"Mr. Isserman: I object to that characterization.

"The Court: I will reform my question.

"Did you mention to the class in that lecture the subject of the dictatorship of the Proletariat?

"The Witness: I didn't mention it at that lecture—

"Mr. Isserman: Just a minute. First of all I wish to object to your Honor's question—

"The Court: Mr. Isserman, I am not going to have any interference here. Now you will just go over there and sit down and then you can say what you want to say afterwards.

"Now, Mr. Marshal, just escort Mr. Isserman over to the seat.

"Mr. Isserman: I would like to make an objection to your Honor's question. Am I allowed to do it?

"The Court: You have made it. Go back and sit down there. (The marshal escorts Mr. Isserman to the seat.) (Mr. Isserman rises.)

"Mr. Isserman: Well, I rise now to object to your Honor's question.

"The Court: Overruled. (Mr. Isserman is seated.)

"The Court: Now, Mrs. Lightfoot, you will give me a direct and responsive answer to that question. In that lecture did you discuss the subject—did you mention the subject of the dictatorship of the Proletariat?

"Mr. Isserman: I object to that question.

"The Court: Overruled.

"Mr. Marshal, will you show Mr. Isserman to his seat?

"Mr. Isserman: May I not stand at this point?

"The Court: You will sit right down. I have had enough contemptuous conduct from you and I am not going to have any more.

"Mr. Isserman: I am not aware of any contemptuous conduct.

"The Court: Well, you will be aware, all right.

"Mr. Isserman: I would like to object to your Honor's remark and I move for a mistrial because your Honor has made the defense impossible.

"The Court: Mr. Marshal, get busy. (Mr. Isserman sits down.)

"The Court (to witness): Now answer that question.

"Mr. Isserman: I object to that.

"The Court: Overruled.

"The Witness: The question—may I hear the question again now; after so much I do not remember it.

"The Court: The reporter will read it—or I will ask you again:

"In that lecture did you mention the subject of the dictatorship of the proletariat?

"Mr. Isserman: I object to that question.

"The Court: Overruled.

"A. In the beginning of that——

"The Court: All right, I sustain the objection to that question. We will have no more of it.

"Go ahead with your next question, Mr. Isserman."

Having successfully prevented the Court from getting an answer, Mr. Gladstein nevertheless then attacked the Court, as follows (Tr. 11,275–11,276):

"Mr. Gladstein: And that includes the badgering tone and the bullying and blustering tone towards the witness.

"The Court: Oh, there is nothing about my tone that is at all noisy or loud.

"Mr. Gladstein: No witness can retain composure and dignity under the attack which your Honor has just levied during the last half hour. I assign it as misconduct.

"The Court: I consider what you said as absolutely contemptuous, Mr. Gladstein. Now you can keep it up all you want but you do it against my orders. (Mr. McGohey rises.)

"The Court: Yes, Mr. McGohey; do you desire to say something?

"Mr. McGohey: I desire to say that certainly your Honor's tone was not loud; there was nothing that I observed in the nature of badgering, and I suggest that now we be allowed to go on with the trial.

"The Court: Yes.

"Mr. Isserman: And I object to Mr. McGohey's remarks as not being in accord with the facts.

"Mr. Gladstein: I would like to say that they are directly contrary to the facts, and I am willing, if your Honor will permit, to have a poll taken of the members of the jury and the people of the press and the people in attendance in this courtroom at this moment as to——

"The Court: Mr. Gladstein, you know earlier in this trial I found that no matter how much leeway I gave counsel they just tried to put the whole administration of justice into disrepute by just the sort of conduct that you are now indulging in, and I tell you now in the most emphatic way that I know without raising my voice, that you are to desist from that. It is wholly improper, as you must know, to talk about having the people in the courtroom polled and having the jury polled as to whether a statement made by somebody is accurate or not. That is all right perhaps in some place but it is not right or proper in a courtroom, and you must know that, so please let the matter go on."

Order had scarcely been restored, when the Court sought to elicit certain information from the witness, which was called for by a question asked by Mr. Isserman. Again Messrs. Isserman and Gladstein successfully prevented the Court from obtaining an answer, as follows (Tr. 11,281–11,284):

"Q. At whose instance did you give that course? A. That was a course given——

"The Court: Why don't you just give the person's name. Who was it that told you to give that course?

"Mr. Gladstein: Well, your Honor, I object to that. It may not have been a person.

"The Court: Overruled.

"Mr. Gladstein: I don't think you should direct the witness that way.

"The Court: Read the question to the witness, please, Mr. Reporter, and see if we can stop this circumlocution. (Question read.)

"A. This course was given——

"The Court: Now, Mrs. Lightfoot, you are going to say at whose instance it was. That means giving the name.

"Mr. Isserman: I want to object to that question.

"Mr. Gladstein: I want to object to the Court making a direction to this witness and pointing his finger at the witness in an intimidating way. I assign that as misconduct, your Honor.

"The Court: Mr. Gladstein, you are perfectly wonderful the way you make these things up.

"Mr. Gladstein: I beg your pardon?

"The Court: Oh, you go ahead now.

"Mr. Gladstein: Does your Honor deny that you——

"Mr. McGohey: Oh, if the Court please, can't we get on with the trial and stop this nonsense?

"The Court: I raised my finger, and the rest of it is sheer imagination but done de-

450

liberately. I know what you are up to, Mr. Gladstein. You and your colleagues here are trying, and again and again have made positively false statements in the record for the purpose of making me appear to be biased and prejudiced and to do the wrong things, that I am not doing. However, I am not going to sit silently by and have you do that.

"Mr. Gladstein: I deny that part of your Honor's statement which charges me with making false statements.

"The Court: I happen to be in charge of this case and I happen to be in charge of this court.

"Mr. Gladstein: I know, your Honor, but I wish the record to show that I deny that part of your Honor's statement that charges me or my colleagues with any false statements, and I not only agree with but affirm that part of your Honor's statement which is to the effect that your Honor is biased and prejudiced.

"The Court: Did I say that? I say you said so very often, and at your table things to be unanimous on that subject. You have attacked me again and again and I suppose you will continue to do it.

"Now, go ahead, Mr. Isserman.

"Mr. Isserman: I join in Mr. Gladstein's denial and object to your Honor's remarks.

"The Court: Yes.

"Do you desire me to have the rest of the counsel give their views, too, Mr. Isserman?

"Defendant Dennis: Your Honor—

"The Court: You may add your bit, Mr. Dennis.

"Defendant Dennis: No. I arise to make a motion for a mistrial first on the basis of the hostile and belligerent and disrespectful attitude of the Court to this witness, which interferes with the testimony and the presentation of our case.

"The second part of my motion is in connection with the ruling of the Court which deprives all counsel frequently not only of stating the grounds of their objection, but even to rise to move an objection.

"And, thirdly, I must say that the motion for a mistrial should be granted because you have placed counsel and the defendants under surveillance of this Court, and the case is actually proceeding now in that way and proceeding by a marshal—in a martial atmosphere.

"The Court: Your motion is denied, Mr. Dennis.

"Defendant Dennis: For those and other reasons I move for a mistrial.

"The Court: The motion is denied.

"Go ahead, Mr. Isserman."

### XXXIII.

On August 5, 1949, shortly after the cross-examination of the witness Robert Manewitz by the United States Attorney began, he was asked when he had resumed activity in the Young Communist League. Thereupon, the following occurred (Tr. 11,577–11,578):

"Mr. Sacher: I object to this line o questioning.

"The Court: Overruled.

"Mr. Sacher: I was kept from—

"The Court: I will have no interruption of the cross-examination; that is over.

"Mr. Sacher: Even if it is justified?

"The Court: I do not desire argument from you, Mr. Sacher—nor impertinence either."

### XXXIV.

On August 10, 1949, in the course of the direct examination of the defendant Robert Thompson, the Court sustained an objection to a question asking the witness to define Marxism-Leninism. Mr. Gladstein then proceeded to argue against the Court's ruling despite the Court's direction that there should be no argument, as follows (Tr. 11,818–11,819):

"Mr. Gladstein: May I call your Honor's attention to the state of the record—

"The Court: No, I don't want to hear any argument about it.

"Mr. Gladstein: But, your Honor—

"The Court: I will hear what this witness directed to be taught, resolutions that he voted for setting up the schools and what was to be taught in the schools, and when the time comes, if it does, for him to testify

what he taught and in particular schools, within certain limitations I will permit. I do not conceive the question before us to be one which makes that question relevant.

"Mr. Gladstein: Would your Honor notice that in the record your Honor permitted the witness Budenz to be asked precisely that question and to give an answer to it?

"The Court: You know I just told you I didn't desire to hear argument but you wanted to get that point in and so again you have become contemptuous. Go ahead.

"Mr. Gladstein: May I ask the witness the very same question that Mr. McGohey asked, your Honor?

"The Court: I tell you, Mr. Gladstein, again, I do not desire to hear argument.

"Mr. Gladstein: I do not want to argue but I am asking permission—

"The Court: No, you are arguing, and you are again contemptuous."

### XXXV.

On August 26, 1949, during the direct examination of the witness Edward Strong, called by the defense, an objection was sustained to a question asked of the witness by Mr. Gladstein. The Court stated that it wanted no argument, and Mr. Gladstein then commented upon the ruling of the Court, in a private aside to the jury, as follows (Tr. 13,169):

"The Court: It is all right. I don't want argument, Mr. Gladstein.

"Mr. Gladstein: That is no—

"Mr. McGohey: What was that?

"Mr. Gladstein: I was talking to myself.

"Mr. McGohey: Were you talking to yourself or part of the jury?

"The Court: I did not hear what was said.

"Mr. McGohey: I heard.

"Mr. Gladstein: I am willing to say what I said.

"Mr. McGohey: Say it.

"The Court: What did you say?

"Mr. Gladstein: Your Honor is asking me and I am replying because your Honor asked, and not because Mr. McGohey directed.

"Your Honor said you did not want any argument, and I said under my breath, 'Well, that is no secret.'

"The Court: I think that is an extremely improper thing for you to do, and to do as you are leaning right on the rail of the jury box there, and I admonish you not to do that again."

### XXXVI.

On August 29, 1949, during the direct examination of the defense witness Max Weiss, Mr. Isserman sought to elicit testimony concerning the disaffiliation by the Communist Party from the Communist International. When the Government objected, the Court heard argument by Mr. Isserman and by the United States Attorney and then overruled the Government's objection (Tr. 13,334–13,337). After some testimony on the subject, the Court sustained an objection to a question concerning a statement at a convention, and Mr. Sacher interjected himself and implied a partiality in the Court's rulings in permitting argument.

In doing so, he again persisted in arguing despite the Court's express statement that it would not hear him (Tr. 13,338):

"Q. Either at the National Committee meeting which you attended in 1940 or the convention you attended in 1940, was there any statement made by anyone that the decision to disaffiliate was one that was a Comintern decision?

"Mr. McGohey: Objection.

"The Court: Sustained.

"Mr. Sacher: May I be heard on that, your Honor?

"The Court: No.

"Mr. Sacher: In view of the fact that Mr. McGohey—

"The Court: I will not hear you.

"Mr. Sacher: But Mr. McGohey was permitted to make a statement concerning this.

"The Court: Mr. McGohey responded to a question from me and further asked leave to address the Court which I permitted. I do not desire to hear you.

"Mr. Sacher: I have asked your Honor for leave.

"The Court: Please be silent, Mr. Sacher. Again you are deliberately contemptuous.

"Mr. Sacher: I am asking an opportunity to reply to Mr. McGohey.

"The Court: Go ahead, Mr. Isserman."

## XXXVII.

On September 9, 1949, during the direct examination of the defendant Carl Winter, Mr. Crockett asked him a question concerning the Black Legion, to which objection was made. The Court sustained the objection and at the same time stated that it did not want argument. Nevertheless, the following occurred (Tr. 13,893–13,894):

"Mr. Crockett: May I point out—

"The Court: I don't want further argument.

"Mr. Crockett: I wanted to say—

"The Court: I think you are in contempt now. Don't do it. I will not have any more. The time for that is over.

"Mr. Sacher: I wish to object to your Honor's characterization of Mr. Crockett's conduct as contempt.

"The Court: You may object. You have done enough of it yourself.

"Mr. Sacher: I wish to object to that characterization. I think the record will prove, I think your Honor has sought to prejudice this jury sufficiently against counsel.

"The Court: You are deliberately contemptuous again.

"Mr. Sacher: I am not. I wish to defend the rights of my clients and the right to advocate their cause, and I resent the constant obstruction of that effort on the part of the Court.

"The Court: There has been no obstruction of effort, but I will have order by the attorneys here, and I will enforce it with every power at my disposal.

"Mr. Crockett: May I ask if the Court is suggesting there has been any disorder by the attorneys?

"The Court: You insisted upon continuing arguing only a moment ago and I told you to stop.

"Mr. Crockett: I was not arguing.

"The Court: That is what you now say but every time you said it you kept it up. Let us stop now and go on with the questions."

## XXXVIII.

On September 14, 1949, in the course of the cross-examination of the defendant Carl Winter, the Government offered a certified photostatic copy of a birth certificate in evidence, to which Mr. Crockett objected. The Court granted leave to him to state the grounds of his objection. However, in place of stating legal grounds for his objection, he argued, as follows (Tr. 14,219–14,220):

"Mr. Crockett: First, I submit that there is an invasion of the family relationship. This refers to a situation which has no relation whatever, and certainly should not be submitted in this court. Certainly I think it is apparent from the exhibit itself that my client's signature appears nowhere on it. There is nothing on that or the original, and I submit that it is taking unfair advantage of a man to show him what —

"The Court: Are you making a legal argument or a speech that we have had here so often?

"Mr. Crockett: Under the circumstances I decline to state any further grounds. There is no point in talking to a Court, when I would like to state the grounds, when it is apparent that his Honor's mind is closed to any grounds that I might state."

Thereupon the Court ruled that only a portion of the exhibit was relevant and said (Tr. 14,222):

"I shall receive the name and the address, and so that there may be no misunderstanding about them I shall read into the record, rather than permitting the exhibit to be handed around to the jury, the following:

" 'Father of the child, full name, Carl Winter, Color or race, Caucasian. Age at time of this birth, 35. Length of residence in California, zero years, three months, zero days. Birth place, Pennsylvania. Usual occupation lecturer. Industry or business: self.' "

At this point Mr. Sacher said (Tr. 14,222–14,223):

"Mr. Sacher: May I call your Honor's attention to the fact that you indicated there were just three items, and that Mr. McGohey limited it to three items? You have read about six now.

"The Witness: May I say, your Honor—

"Mr. Sacher: Just the name and address, as I recall it.

"The Witness: May I address the Court?

"Mr. Sacher: Name, address, and date.

"Mr. Crockett: If the Court please—

"The Court: Is this additional part that I read very objectionable to you?"

At this juncture, Mr. Crockett made a statement which, by its sarcastic emphasis on the word "seemingly," accused the Court of intentionally reading more of the exhibit than should have been read, as follows (Tr. 14,223):

"Mr. Crockett: If the Court please, in view of your Honor's seemingly unintentional reading more than—

"The Court: Mr. Crockett, that is one of the most contemptuous things that has occurred at this trial.

"Mr. Crockett: I am trying—

"The Court: And for that you will be brought to justice.

"Mr. Crockett: I am trying to say, with the Court's permission—

"The Court: You just bear that in mind, Mr. Crockett.

"Mr. Crockett: Your Honor, may I—

"The Court: You say I seemingly do something and accuse me of deliberately evil motives here. That is something that I cannot pass over and I shall not. I now adjudge you in contempt for that."

### XXXIX.

At the same session of the Court, the following occurred during the cross-examination of the defendant Carl Winter concerning his use of an alias (Tr. 14,240–14,241):

"Q. Now I show you what purports to be the Los Angeles Extended Area Telephone Directory of March 1943, issued by the Southern California Telephone Company and I direct your attention to page 202—

"Mr. Sacher: Just a moment. I object to that question.

"The Court: Overruled.

"Mr. Sacher: I would like to be heard if I may.

"The Court: I don't desire to hear you, Mr. Sacher.

"Mr. Sacher: Will there come a day, your Honor, when you will hear us?"

### XL.

On October 4, 1949, the day after the Court had filed an opinion denying the request of the defendant Benjamin J. Davis, Jr., to discharge Mr. Sacher as his counsel lengthy argument was made by Mr. Davis, Mr. Sacher, Mr. Isserman, Mr. McCabe, Mr. Crockett, Mr. Gladstein, and Mr. Dennis, that the Court reconsider its ruling. Immediately following the statement that the Court adhered to its ruling, Mr. Dennis moved for a mistrial. In stating the grounds Mr. Dennis, without any foundation, accused the Court of racial bias, saying (Tr. 15,293–15,294): "In the light of the fact that the Court has recognized my inalienable constitutional rights and granted me a white Communist, a defendant, who is not a lawyer, the right to conduct my own defense, its denial of this right to Mr. Davis, a Negro Communist, a defendant who happens to be a lawyer, can only be construed as an act of gross discrimination and an affront to the Negro people." Dated: October 14, 1949.

Harold R. Medina,
*U. S. D. J.*

FRANK, Circuit Judge, concurring (except as to Specification I)*.

1. "Friends of the court" have filed with us a large number of briefs which eloquently recall how, in the past, courageous law-

---

* This concurring opinion has been revised after a consideration of the petition for rehearing. The previous concurring opinion has been withdrawn.

yers have importantly contributed to liberty and democracy by defending unpopular clients, despite the browbeating of tyrannical, domineering, trial judges. In those briefs, fear is expressed that, if we affirm any of the contempt orders in this case, lawyers for labor unions or for minority groups or for unpopular persons will, in the future, be intimidated or throttled.

The eloquence is misplaced. The fears are unfounded. We affirm the orders punishing these lawyers not because they courageously defended their clients, or because those clients were Communists, but only because of the lawyers' outrageous conduct—conduct of a kind which no lawyer owes his client, which cannot ever be justified, and which was never employed by those advocates, for minorities or for the unpopular, whose courage has made lawyerdom proud. The acts of the lawyers for the defendants in this trial can make no sensible man proud.

What they did was like assaulting the pilot of an aeroplane in flight, or turning out the lights during a surgical operation. To use homelier words, they tried to throw a wrench in the machinery of justice. Whatever may have been their purpose, their acts might have made a trial of their clients impossible. Not to punish such behavior summarily, but, instead, to require a long trial of these lawyers,[1] might well be to encourage that sort of behavior. The summary punishment here will tend to deter imitation of that behavior in other trials. If it is not deterred, the administration of justice in our courts is highly likely to break down.

The basis of our decision is as simple as that. We affirm these orders, not because the personal "dignity" of the trial judge was affronted; for such dignity, when it exists, manifests itself, needs no punitive safeguards.[2] We affirm for the plain reason that the crude antics of these lawyers, if copied by lawyers in other cases, would almost surely disrupt trials.

Here we come to the heart of the matter: Preservation of the liberties of citizens, when on trial for crimes charged against them, demands order in the courtroom. Absent such order, no trial can be fair. More important, if criminal trials cannot go on in orderly fashion, then the defendants, if unpopular or if members of minority groups, may become the victims of that monstrous substitute for trials— mob violence. The gravest danger to those minorities, on whose behalf the "friends of the court" have spoken, could easily result from a denial of the power of a trial judge to deal with trial-disrupters as the judge has dealt with the lawyers here. In short, the protection of civil liberties calls for sustaining the contempt judgments in this case.

The trial judge, it is urged, committed grave errors at the trial, in that he improperly barred the lawyers from presenting evidence on their clients' behalf, and from stating objections to his rulings adverse to those clients. Whether he thus erred we do not at all consider on these appeals; those asserted errors will be fully canvassed later, when the appeals of these lawyers' clients are heard by this court. Even, however, if (for the sake of the argument) we were now to assume that the trial judge made those serious mistakes, that fact could not excuse the tactics of these lawyers. Often upper courts have reversed convictions because trial judges seriously misbehaved. But the lawyers who ably succeeded in procuring those reversals did not, during the trials, demean themselves in a disgraceful way. Every lawyer knows that brawling at a trial is not an effective means of bringing about the reversal of an erring judge. We have had quoted to us, from the Canons of Professional Ethics, a basic principle of the legal profession that "no fear of judicial disfavor or public unpopularity should restrain" a lawyer "from the full discharge of his duty" to his client. But we cannot agree that fearless discharge of that duty requires or permits a lawyer

1. See infra as to the prolonged character of such a trial.
2. Cf. Bridges v. California, 314 U.S. 252,

62 S.Ct. 190, 86 L.Ed. 192, 159 A.L.R. 1346; cf. Frank, Courts on Trial (1949), 256-261.

to turn a trial into a bar-room squabble. Nothing in our decision will alarm any lawyer, no matter what client he represents, who behaves as the overwhelming majority of our lawyers fortunately do.

2. Of course, the gravity of the lawyers' misbehavior does not settle the question whether punishment by summary procedure was legally permissible. To that question I now turn.

Undeniably, to punish summarily for contempt—to charge and hold a man guilty of a crime without a trial—is, and should be, a most extraordinary exception in a civilized legal system; ordinarily, in this country an accused person is constitutionally entitled to a trial and before some one other than his accuser. But Congress and the Supreme Court have recognized one exception: The statute and the Rule (promulgated by the Supreme Court) explicitly authorize a trial judge to punish summarily—without a trial before another judge—conduct (a) which is contemptuous and (b) which the judge "saw and heard," it being "committed in the actual presence of the court." The validity of that statute or of that Rule is not challenged here by anyone.

Such exceptional procedure is designed, says the Supreme Court, "to prevent 'demoralization of the court's authority,' before the public."[3] And (other than the conduct described in Specification I) all the acts for which here the judge punished the lawyers were seen and heard by him, and happened in the court-room.

Specification I, however, charges that the lawyers "joined in a wilful, deliberate and concerted effort to delay and obstruct the trial." This, I think, charges something in the nature of a conspiracy; and a conspiracy, inherently, involves an agreement. Although what happened in the judge's presence was powerful evidence of such an agreement, the agreement itself, if there was one, presumably was made out of court; at any rate, it cannot be conclusively presumed that it was made in the judge's presence; it is not entirely inconceivable that the inference of a conspiracy could be rebutted by evidence of matters not seen or heard or considered by the judge. In those circumstances, the judge, I think, could not properly sentence the lawyers under Specification I without a hearing, at which they would have the opportunity to offer evidence tending to show that they had not entered into a conspiracy. As this Specification involves both (a) possible out-of-court conduct and (b) "disrespect to or criticism of" the trial judge himself, I think the hearing (if ever there is one) must, under Rule 42(b), be before another judge.[4] In but this one respect, I diverge from Judge Hand and agree with Judge Clark.

But the consequent reversal as to Specification I can have no practical effect. For the sentences of each of the lawyers run concurrently, and the record, as Judge Hand has shown, amply supports the other Specifications.[5]

3. So far as those Specifications are concerned—since they all charge acts in the court-room, seen and heard by the judge—the question of conspiracy is wholly irrelevant, because Specification I, being distinct and separate, cannot be read into those other Specifications. Nor, I think, was the conspiracy charge imported into them

3. In re Oliver, 333 U.S. 257, 275–276, 68 S.Ct. 499, 509, 92 L.Ed. 682; Cooke v. U. S., 267 U.S. 517, 536, 45 S.Ct. 390, 69 L.Ed. 767.

4. Rule 42 (b) provides that where the summary procedure is not authorized by Rule 42 (a), so that a hearing must be held, that hearing must be before a judge other than the trial judge, if the charged acts of contempt involve "disrespect to or criticism of" the trial judge. But that provision of Rule 42 (b) does not apply where summary procedure is authorized by Rule 42 (a).

The Advisory Committee, with reference to Rule 42(b), cites the Norris-La Guardia Act, 29 U.S.C.A. §§ 101–115. Note that 29 U.S.C.A. § 112, provides that the defendant in a contempt proceeding may demand retirement of the judge "if the contempt arises from an attack upon the character or conduct of such judge and if the attack occurred elsewhere than in the presence of the court. * * *"

5. With the exception as to Sacher of Specifications XV and XVIII, as noted by Judge Hand.

by the trial judge's preliminary remarks. For I agree with Judge Hand that we should ignore those remarks as superfluous, since they are but the equivalent of the action of a trial judge who (after a defendant has been properly held guilty) fixes a long sentence—within the permitted statutory limits—due to his belief that the defendant, out of court and without reference to the case on trial, had misbehaved. It has been held that such a belief has no bearing on the propriety of the sentence itself.[6]

4. Putting aside the conspiracy issue, no one asserts that, because the charges involved "disrespect of or criticism" of the judge, the summary procedure was improper.[7] The only argument made against its validity is that the judge did not sentence instantly after each offense occurred. In other words, it is argued that these lawyers are entitled to a trial, and before another judge, for the one and only one reason—apart from the contention (already considered) based on the conspiracy—that the trial judge, instead of acting on the impulse of the moment, restrained himself and sentenced at a later time.

This delay-argument (which finds no support in any explicit provision of the applicable statute or the Rule) takes several forms. Analysis is needed to expose its fallacies. It should first be noted that summary punishment necessarily has none but a future effect, for always that open-court obstruction or interruption of the court's business which justifies such punishment has, in the nature of things, already happened and cannot be prevented by any sort of punishment. No punishment, summary or otherwise, will undo the contempt, ever a thing of the past. Therefore, the exceptional power to punish summarily cannot be founded on the ability to forestall the

punished behavior. Summary punishment, then, since its effect is wholly prospective, must be justified solely by the fact that it will tend to prevent future misconduct—either (1) in the future course of the same case or (2) in other future cases.

(a) The first form of the delay-argument assumes that here the case was over when (on October 14) the judge entered his contempt orders. In actual fact, it was not then over. Not until a week later (on October 21) did the judge (a) have presented to him the motions for new trial and arrest of judgment, made by the lawyers on behalf of their clients, and (b) hear lengthy arguments from the lawyers on the sentences to be imposed on those clients, and on the motions for bail, for those clients, pending appeal; only on that day (October 21) did the case terminate in the trial court, with the denial of those motions and the sentencing of the clients.

However, on the mistaken assumption of fact that the case was closed when the judge summarily punished the lawyers, the following argument is advanced:

Summary punishment is valid only if it will tend, by example, to stop future improper interruptions of the case then before the court—of the very same case in which the interruption happened. If, therefore, an in-court disturbance, no matter how shocking, is not immediately punished, and if, despite that disturbance, the case is not actually broken up but is able to reach its conclusion, summary punishment then imposed cannot serve its primary purpose—i. e., prevention (by example) of further interferences with that particular case—and is always forbidden. Never, it is contended, may the drastic summary method be used when its only possible value (aside

---

6. See, e. g., Williams v. New York, 337 U.S. 241, 69 S.Ct. 1079; Bailey v. United States, 7 Cir., 284 F. 126, 127; Peterson v. United States, 4 Cir., 246 F. 118, 119; Stobble v. United States, 7 Cir., 91 F.2d 69, 71; Hunter v. United States, 6 Cir., 149 F.2d 710; State v. Martin, 49 Utah 346, 164 P. 500, 502–503; State v. Bjelkstrom, 20 S.D. 1, 104 N.W. 481, 483; Cason v. State, 16 Ga. App. 820, 86 S.E. 644, 648.

In Eckerson v. Tanney, D.C., 235 F. 415, 418, answering an argument that a recital in a judgment "spoiled" it, Judge Learned Hand said that "the judgment does not reside in its recitals, but in the mandatory provisions." See, to same effect, Standard Oil Co. v. Clark, 2 Cir., 163 F.2d 917, 928.

7. See note 4.

from punishing the disturber) will be to deter, by example, similar interruptions of future cases.

In blunt terms, that contention would have this surprising result: Suppose that, in a criminal case, the jury had brought in its verdict and had been discharged; that the trial judge had then at once heard and denied a motion for a new trial; and that he had then sentenced the defendant, thus ending the case. Suppose that, after the defendant and all participants in that case had departed, and while the judge was waiting, in open court, for another case to be called, someone in the court-room, shouting that the judge was a tyrant, threw an ink-bottle at him. According to this contention, the judge could not validly cite and punish the offender summarily, but would have to accord him a hearing, before another judge, with an opportunity to offer evidence. Why? Because the offense could not possibly disturb any case pending before the court, for there was none, and the summary punishment could do no more than to deter misconduct in other, later, cases.

This contention, even were it sound, could not apply here. For here, as already noted, the case had not ended, so that the punishment of the lawyers could still tend to prevent further disturbances, in the very same case, by those lawyers or other persons.

But we need not consider that here the case had not ended, for the whole theory is unsound. It cannot be squared with the leading decision on the subject of summary contempt procedure, Ex parte Terry, 128 U.S. 289, 9 S.Ct. 77, 32 L.Ed. 405, where the case was over before the disturber was charged with contempt and summarily punished. These were the facts: After the circuit court had concluded its hearing of a pending case, the presiding judge began, in open court, to read the court's opinion embodying its decision of that case. Terry's improper conduct interrupted that reading, and he then left the court-room. The court did not, at once, cite and sentence him. Instead, the presiding judge resumed his reading of the court's opinion. When he finished that reading, that case terminated. Only then did the court cite and summarily sentence Terry for contempt.[8] Obviously, that summary procedure could not have prevented further interruptions by anyone of the progress of the case which Terry had interrupted. The summary punishment could have served no purpose other than to deter like interference (by Terry or others) with other cases.

It is said, in an attempted distinction of Terry's case, that there the delay was short, while here it was long.[9] I fail to understand how the shortness, in Terry's case, of the interval between misconduct and punishment can support the in-the-very-same-case argument.[10] For that shortness cannot alter the basic fact that, in Terry's case, the summary punishment could not conceivably tend to prevent anyone from interfering with the orderly progress of the very case in which the improper interference took place. If, then, an exclusively in-future-cases-deterring effect does not suffice to sustain a summary contempt proceed-

---

8. The facts appear in the report of the Terry case in the lower court. In re Terry, 9 Cir., 36 F. 419, 420: "As soon as the disturbance had ceased, Justice Field proceeded with the reading of the opinion, after which orders were made by the court adjudging Mr. and Mrs. Terry guilty of contempt, and directing their imprisonment as a punishment therefor."

9. In Terry's case, the Supreme Court cited with approval Middlebrook v. State, 43 Conn. 257, 21 Am.Rep. 650, where there was an interval of sixteen days between the contemptuous act and the summary punishment, which was meted out after the case was over. It is suggested that the delay there was justified because the offender had fled the state, and the sixteen days were spent in efforts to bring him back in custody. But if the sole basis of the summary procedure is that it operates to deter further disturbances in the same case, it would be of no significance why the procedure was delayed. For, whatever the reason, the punishment could no longer function as a deterrent of misconduct except as to future cases.

10. The relation of that interval to jurisdiction over Terry's person is discussed *infra*.

ing, Terry's case was wrongly decided. But the Advisory Committee's note to Rule 42(a)—the Rule authorizing summary contempt procedure—reads: "This Rule is substantially a restatement of existing law"; and the note cites Ex parte Terry in support of that statement.

That the in-future-cases-deterring effect is the primary reason for permitting summary punishment of in-court contempt appears from In re Oliver, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682. There the lower court had summarily punished alleged misconduct occurring at a secret court hearing. The Supreme Court held the summary procedure constitutionally invalid. After observing, 333 U.S. at page 275, 68 S.Ct. at page 509, that summary punishment may be used only where it is essential to prevent "demoralization of the Court's authority before the public," the Supreme Court said, 333 U.S. at page 276, 68 S.Ct. at page 509: "Since the petitioner's alleged misconduct all occurred in secret, there could be no possibility of a demoralization of the court's authority before the public." [11] In other words, the Supreme Court was saying that, since the misbehavior could not be known to other persons, and thus could not stimulate them to obstruct other trials, therefore, on that ground alone, summary punishment was improper. Someone, to be sure, may suggest that the Supreme Court did not have in mind the protection of a "court's authority before the public" through such

deterrence of others in other trials, but meant merely the preservation of the judiciary's general glamor or a worshipful public attitude towards judges. But in 1821 the Supreme Court made it plain that the judicial power to punish contempt did not rest on so weak a foundation as the judges' desire for public admiration;[12] and the Supreme Court, in effect, said the same 120 years later, in 1941.[13]

On the basis of the Oliver case, appellants however argue: "The prevention of such demoralization is the reason for making contempt a crime—not for imposing punishment without trial. It represents the rationale for punishment, not for the method by which it is imposed." A reading of the Oliver opinion will answer this argument: The Court, I think, there held that, because there was no demoralization of the court's authority "before the public," summary punishment—but, by no means, every other form of punishment for contempt—was improper.

Criminologists disagree concerning the extent to which punishing one man deters other men. But there is general agreement that, in some instances at least, punishment acts both directly, as a preventive example to others, and indirectly, as a means of creating or strengthening social habits of conduct.[14] There can be little doubt that summary punishment of contempt, in a case like this, will have both effects.

11. Another ground for the Oliver decision is discussed *infra*.

12. See Anderson v. Dunn, 6 Wheat. 204, 226, 5 L.Ed. 242: "But if there is one maxim which necessarily rides over all others, in the practical application of government, it is, that the public functionaries must be left at liberty to exercise the powers which the people have intrusted to them. * * * The unreasonable murmurs of individuals against the restraints of society, have a direct tendency to produce that worst of all despotisms, which makes every individual the tyrant over his neighbor's rights. That 'the safety of the people is the supreme law' not only comports with, but is indispensable to, the exercise of those powers in their public functionaries without which that safety cannot be guarded. On

this principle it is, that courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect and decorum in their presence, and submission to their lawful mandates, and as a corollary to this proposition, to preserve themselves and their officers from the approach and insults of pollution."

13. Bridges v. California, 314 U.S. 252. The opinions in the Bridges and Oliver cases were both by Mr. Justice Black.

14. Concerning the educational value of "law," especially "criminal law," see West, Conscience and Society (1945), 165 et seq.; West, A Psychological Theory of Law, in Interpretations of Modern Legal Philosophies (1947), 767; Cahn, The Sense of Injustice (1949), 105 et seq.

Counsel for these lawyers conceded that —so far as the contempt orders rested entirely on in-court acts—the summary procedure would have been beyond complaint if the judge had immediately cited and sentenced for each contemptuous act, deferring the execution of the several sentences until the trial's end. To the extent that that practice would have been in the interest of fairness, by way of warning to the lawyers, what the judge did here was the equivalent: He repeatedly told the lawyers that he considered their conduct contemptuous, and he repeatedly warned that punishment would ensue. It seems immaterial that some of the warnings indicated punishment by some other authority and not by the judge himself.

Had the judge, in each instance, cited and sentenced immediately—although deferring execution—he would have been obliged to stop this trial more than thirty times, in order to prepare, pursuant to Rule 42(a), written orders specifying, in each instance, the particular contempt. Moreover, in each such instance, the sentenced lawyer would doubtless immediately have appealed, and would have had the right to argue the appeal *pro se*. The trial judge would then have had to adjourn the trial at least thirty times to allow the lawyers to prepare and argue those appeals.

(b) A variant of the delay-argument runs as follows: Summary punishment must be instanter; it is invalid if postponed, even when the delay is not until the case's end. Thus, if the judge waits a day, or a week, or several weeks, he cannot punish summarily, although, as here, the very same case is still in progress when he punishes.

This argument puts a premium on hasty action. It means that the judge may act summarily only when he is least likely to be poised and temperate, that only then may he act without a hearing. Why such instant action is fairness or due process—adequately protective of the accused—and postponed action is not, remains unexplained by proponents of this contention. Curiously enough, those who (1) argue that such instant action is an indispensable condition of summary punishment also (2)

counsel (and wisely) that the use of the summary power be narrowly circumscribed, for fear that the trial judge, in using it, may do so in haste, spurred to vindictiveness by the anger of the moment. I find it difficult to reconcile those two contentions: The first insists that summary punishment is not valid unless hasty. The second points to the potential danger of haste.

There is such danger. Judges, being human, may, on occasions, respond excessively to slight provocations, if they act impulsively. Where, as here, the judge waited and reflected before he acted, there is considerable assurance that impulsiveness could not have affected him.

We are asked by appellants to believe that the constitutional safeguards of judicial justice in the case of open-court contempts will be best preserved, and that "dictatorial authority" in the punishment of such contempts will be best avoided, if—what? If we instruct trial judges that summary punishment of such contempts must invariably be imposed at once, which means that trial judges may punish such contempts summarily when—and only when—they act in hot blood, *i. e.,* in circumstances promoting, to the utmost, impatient, ill-considered, judgment. We cannot accept that view. For it seems exactly upside-down.

Consider, for instance, the offenses described in Specification XXXII: The judge attempted to obtain from a defense witness an answer to a single, simple, question; two of the defense lawyers so frequently and persistently interrupted that the judge, worn out and in despair, gave up the attempt, and the question went unanswered. The judge would have been a superman had that almost unexampled misconduct not so raised his blood-pressure as to rob him of the capacity, at or about that time, to deal calmly with the contempt. Yet appellants assert, in effect, that, if he had at once sentenced those two lawyers, he would have given a decision wholly satisfying the requirements of the Constitution (as well as the statute, the Rule, and our traditions), but that he violated all those requirements because, after the lapse of several weeks, with the case not yet ended, he acted in a

mood of greater calmness. It would be a strange topsy-turvy doctrine that judicial justice is carefully and constitutionally administered when a judge explosively goes into high-blood-pressured action, but that it becomes dangerously careless—and unconstitutional—when the judge, controlling his temper, gives himself a chance to cool off and to act deliberately. It is a quaint idea that a judge's white-hot indignation is a better guaranty of justice than his more seasoned judgment.

5. Ex parte Terry, 128 U.S. 289, 9 S.Ct. 77, 32 L.Ed. 405, raised a jurisdictional problem not previously discussed in this opinion. That case arose not on appeal from the contempt order but on an original application in the Supreme Court for a writ of habeas corpus, alleging the circuit court's lack of jurisdiction over Terry's person at the time when it entered the contempt order. In their brief in the Supreme Court, 128 U.S. at page 291–293, 9 S.Ct. 77, Terry's counsel argued as follows: After creating the disturbance in the circuit court, Terry had left the court-room without being advised that the circuit court proposed to punish him; that court, having made no effort to bring him back, without notice and in his absence adjudged him in contempt and ordered his imprisonment; consequently, he "had no intimation of the existence" of the contempt proceedings "or that they would be instituted"; because he was absent, the circuit court could have obtained jurisdiction of his person only by service upon him of some sort of notice; due to the want of such notice, the circuit court lacked jurisdiction of his person; therefore, the imprisonment order was void.[15]

The Supreme Court denied the application for the writ, saying in part, 128 U.S. at pages 311, 313–314, 9 S.Ct. at page 82: "The precise question, therefore, to be now determined, is whether the retirement of the petitioner from the court-room, into another room of the same building, after he had been guilty of misbehavior in the presence of the court * * * defeated the jurisdiction which it possessed, at the moment the contempt was committed, to order his immediate imprisonment without other proof than that supplied by its actual knowledge and view of the facts, and without examination or trial in any form? In our judgment this question must be answered in the negative. Jurisdiction of the person of the petitioner attached instantly upon the contempt being committed in the presence of the court. That jurisdiction was neither surrendered nor lost by delay on the part of the Circuit Court in exercising its power to proceed, without notice and proof, and upon its own view of what occurred, to immediate punishment. * * * To say, in case of a contempt such as is recited in the order below, that the offender was accused, tried, adjudged to be guilty and imprisoned, without previous notice of the accusation against him and without an opportunity to be heard, is nothing more than an argument or protest against investing any court, however exalted, or however extensive its general jurisdiction, with the power of proceeding summarily, without further proof or trial, for direct contempts committed in its presence."

The Supreme Court, noting that the circuit court entered its order on the same day as Terry's offense, concluded, 128 U.S. at

---

15. The argument, as reported in 128 U.S. at pages 292–293, 9 S.Ct. 77, reads in part as follows: "The averment of the relator is that when the proceedings in contempt were begun, continued and ended, he was absent from the court—*had no intimation of the existence of such proceedings or that they would be instituted*, and had no opportunity to be heard. Here, then, is * * * an averment of a fact going directly to the power of the court to either consider the merits or render the judgment of imprisonment. That such fact *of the service required to give jurisdiction* is one always open to proof in attacking a judgment, see Biddle v. Wil-

kins, 1 Pet. 686, 7 L.Ed. 315 * * * We *do not deny that it was within the power of the court instantly, upon the commission, in its presence, of the alleged contempt, and the offender continuing to be present, to adjudge the offending party guilty of contempt, and to order imprisonment. But here the record discloses not only that the petitioner was not instantly proceeded against, but that he was allowed to depart from the court, and was not again brought before it in such a way as to compel him to take notice of all orders and steps in the totally-separate and distinct proceedings in the contempt case.*"

page 314, 9 S.Ct. at page 83, that the "jurisdiction" of the circuit court "was as full and complete as when he was in the courtroom in the immediate presence of the judges." The Supreme Court left open the following jurisdictional question: "Whether the Circuit Court would have had the power at a subsequent term, or at a subsequent day of the same term, to order his arrest and imprisonment for the contempt, *without first causing him to be brought into its presence,* or without making reasonable efforts by rule or attachment to bring him into court, and giving him an opportunity to be heard before being fined and imprisoned. * * *" To this date the Supreme Court has not answered that question.[16] Whether the question is present in this case may be doubted. If it were, I think the Supreme Court would answer that the judge retained jurisdiction of the persons of the several lawyers. For, although they left the courtroom after committing the contempts, they voluntarily returned, in connection with their obligations to their clients, in the same case, so that, in that manner and for that purpose, the lawyers were present in court when the judge charged and sentenced them.[17]

6. The judge had discretion either to proceed summarily or to direct a full hearing. He chose the summary method. Whether any of us, had he been the trial judge, would have made that choice is of no moment. He did not abuse his discretion. He had the power to proceed as he did, in order "to prevent 'demoralization of the court's authority' before the public."

In making up his mind, he could properly take into account that a trial would be long drawn out. What would be the protracted nature of the defense at such a trial was pretty clearly indicated by the suggestion made by Gladstein (see Specification XXXII) that a poll be taken of "the members of the jury and the people of the press" and of others in the court-room as to whether the judge had used "a badgering, bullying and blustering tone" in addressing a witness. For instance, in all likelihood, at a trial of the lawyers, Sacher would introduce the testimony of himself and others in an effort to prove that he was not "angrily shouting," as charged in Specification VII, and did not speak "in an insolent manner," as charged in Specification VIII; Gladstein would similarly seek to prove there he did not "angrily" advance "toward the bench" or make remarks in a "truculent manner," as charged in Specification VIII, and did not speak to the judge "in a sarcastic and impertinent manner," as charged in Specification XI; etc., etc.

It cannot be contended that the summary procedure was inadequate because the judge, before sentencing, did not allow the lawyers to explain their conduct or object to his findings. For immediately after sentencing them, he gave them the opportunity to make such explanations and objections, which, as Judge Hand has shown, were wholly inadequate, and supplied no ground for vacating the sentences.

7. Stressing the unquestionably exceptional nature of the summary contempt procedure, these lawyers assert their absolute right to a trial. This assertion they accompany by references to, and quotations from,

---

16. Some indication of the Supreme Court's answer is found in the fact that (as previously noted) the Court in Terry's case, 128 U.S. at page 312, 9 S.Ct. 77, 82, cited and quoted from Middlebrook v. State, 43 Conn. 257, 21 Am.Rep. 650, where the offender, after his misconduct in open court, "left the court-house and the State." There, failing "to procure his attendance" after sixteen days, the court, in his absence, sentenced him for contempt. The Supreme Court quoted a portion of the Connecticut court's opinion which held that "the jurisdiction remained," and which concluded: "If it was necessary that the judgment should be preceded by a trial, and the facts found upon a judicial hearing, as with ordinary criminal cases, it would be otherwise. But in this proceeding nothing of the kind was required. The judicial eye witnessed the act, and the judicial mind comprehended all the circumstances of aggravation, provocation, or mitigation; and, the fact being thus judicially established, it only remained for the judicial arm to inflict proper punishment."

17. The facts in this respect are like those in In re Maury, 205 Fed. 626 (C.A. 9).

statements by Mr. Justice Holmes.[18] Those statements, however, are torn from their contexts since, in them, Holmes discussed contempt-punishment for out-of-court acts, and not for in-court acts like those that occurred in this case (and are charged in the Specifications other than Specification I). To yank Holmes' phrases from their settings and then to employ them as bludgeon-like, thought-stopping, slogans,[19] traduces some of Holmes' strongest convictions: Objecting to just such misapplication of a well-known judicial utterance, he remarked, "It is one of the misfortunes of the law that ideas become encysted in phrases and thereafter for a long time cease to provoke further analysis."[20] And surely there is irony in the invocation of Holmes as a sponsor of undeviatingly absolute rights; for, beyond most men, he had a keen awareness of the inherent limitations of any legal right, when it comes into competition with another. Outstandingly, he cautioned, in effect, that virtually no rights are unqualified; that seldom can a right, hermit-wise, live alone; and that usually isolationism for any single right is socially dangerous.[21]

Also quoted out of context by appellants are sentences in the opinions in Cooke v. U. S., 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767, in In re Michael, 326 U.S. 224, 66 S.Ct. 78, 90 L.Ed. 30, and in In re Oliver, 333 U. S. 257, 68 S.Ct. 499, 92 L.Ed. 682. The Cooke case related to out-of-court contempt. In re Michael held that perjury alone did not constitute contempt. In the Oliver case, as already noted, the Supreme Court upset the contempt order because the asserted misconduct occurred in a secret hearing. Moreover, that misconduct consisted of Oliver's alleged perjury before the judge, but the judge, in concluding that Oliver had committed perjury, relied upon testimony, contradicting Oliver's, of other witnesses who testified when Oliver was absent. The Supreme Court, on that ground, differentiated that case from one where— as in the case at bar—the judge had observed the contemptuous act; the Supreme Court said 333 U.S. at page 277, 68 S.Ct. at page 509, 92 L.Ed. 982: "This case would be like the Terry case only if the judge there had not personally witnessed Terry's assault upon the marshal but had nevertheless sent him to jail * * * after hearing the testimony of witnesses against Terry in Terry's absence."

---

18. See his dissenting opinions in Toledo Newspaper Co. v. United States, 247 U.S. 402, 422, 38 S.Ct. 560, 62 L.Ed. 1186; and in Craig v. Hecht, 263 U.S. 255, 280, 44 S.Ct. 103, 68 L.Ed. 293.

19. "The use of slogans is natural and, up to a point, beneficial. The point is passed when the slogan is taken for an argument and relevant complexities are ignored." Stebbing, Thinking to Some Purpose (1939) 69.

20. Hyde v. United States, 225 U.S. 347, 384, 391, 32 S.Ct. 793, 811, 56 L.Ed. 1114, Ann.Cas.1914A, 614.

21. See, e. g., Hudson County Water Co. v. McCarter, 209 U.S. 349, 355, 28 S.Ct. 529, 531, 52 L.Ed. 828, 14 Ann.Cas. 560: "All rights tend to declare themselves absolute to their logical extreme. Yet all in fact are limited by the neighborhood of principles of policy which are other than those on which the particular right is founded, and which become strong enough to hold their own when a certain point is reached." In American Bank & Trust Co. v. Federal Reserve Bank, 256 U.S. 350, 358, 41 S.Ct. 499, 500, 65 L.Ed. 983, he wrote that "the word 'right' is one of the most deceptive of pitfalls; it is so easy to slip from a qualified meaning in the premise to an unqualified one in the conclusion. Most rights are qualified."

Compare the following: "The practical legal * * * art must have as its special province the setting of a limit to opposing conceptions. * * * It is * * * extremely dangerous to abuse [legal principles] by pushing them to extreme; one ruling principle would then cause the rejection of another equally reasonable. * * * Nothing is more dangerous than to allow [simple principles] to be followed to their extreme consequences; in such cases appear the terrors of a great idea in small brains." Demogue, Analysis of Fundamental Notions (1911) in the volume Modern French Legal Philosophies (transl.1916) 351, 399, 411, 413. "It is not logical to push a conclusion to an 'extreme', i. e., further than the facts warrant; on the contrary, a conclusion is logical only if it does follow from the premises upon which it is based." Stebbing, Thinking To Some Purpose (1939) 21.

8. It is argued that our failure to reverse all these orders will invite other trial judges, impatient or over-sensitive about their dignity, to exercise the summary contempt power in cases where it should not be exercised. Borrowing again from Mr. Justice Holmes, we may answer, "Not while this court sits."[22] Long ago a wise man said, "And if it be objected that one who uses such power * * * unjustly might do great harm, that is a charge which may be made * * * against * * * the things that are most useful * * *"[23] Were the possibility of abusing discretionary power to lead to its blanket rejection, all government would be paralyzed.[24] We must not, by overly refined distinctions, substantially wipe out the judicial discretion used here, but must—as we shall, whenever necessary in future cases—prevent its misuse.

CLARK, Circuit Judge (dissenting).

To one schooled in Anglo-Saxon traditions of legal decorum, the resistance pressed by these appellants on various occasions to the rulings of the trial judge necessarily appears abominable. Yet such natural emotional reaction does not of itself prove that they should be imprisoned without a hearing weeks or months after the events. For the law must both appear and be inexorable rather than vindictive; and the constitutional course of due process requires that conviction and sentence come only after orderly hearing upon announced charges and full opportunity to the accused to defend themselves. True, there is a single exception resting on necessity and common sense. If there are breaches of courtroom behavior to the point of preventing the proper functioning of the court, the judge has the authority to take the necessary steps to secure order. But if the difficulty does not require so drastic steps— has indeed been surmounted without resort to them—and the question is one only of

punishment, as retribution and example, then the ordinary requirements of due process must be satisfied. For the person accused of a criminal contempt, like any other accused, is entitled to the opportunity to exculpate himself, so far as his evidence permits, before being sentenced to imprisonment. Hence the immediate issue in this case is not at all as between appropriate punishment and complete immunity from penalty; it is as to the manner in which the question of guilt or punishment can be legally and appropriately tried, or more broadly the course which will best preserve at once the rights of the accused and the dignity of the law in accordance with the highest standards of American justice.

The distinction I have just indicated between summary action for contempt to permit the court to function and the more leisurely but determined course of hearing to settle the punishment for violation of court orders is quite thoroughly settled in the cases. Indeed, it has been vigorously restated only recently by the Supreme Court. "Except for a narrowly limited category of contempts, due process of law as explained in the Cooke case requires that one charged with contempt of court be advised of the charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses in his behalf, either by way of defense or explanation. The narrow exception to these due process requirements includes only charges of misconduct, in open court, in the presence of the judge, which disturbs the court's business, where all of the essential elements of the misconduct are under the eye of the court, are actually observed by the court, and where immediate punishment is essential to prevent 'demoralization of the court's authority' before the public. * * * The right to be heard in open court

22. Panhandle Oil Co. v. Knox, 277 U.S. 218, 222, 223.

23. Aristotle, Rhetoric 1355b.
    He was referring to the power to argue effectively, but his remark is nonetheless pertinent.

24. See, e. g., Douglas, Democracy and Finance (1940) 243ff; Frank, If Men Were Angels (1942) Chapters 1, 3, 10 and 12.

before one is condemned is too valuable to be whittled away under the guise of 'demoralization of the court's authority.'" In re Oliver, 333 U.S. 257, 275, 278, 68 S.Ct. 499, 500, 92 L.Ed. 682. Thus, too, the recent Federal Rules of Criminal Procedure, while recognizing the summary contempt power, indicate the extraordinary character of that remedy and prescribe elaborate safeguards of notice and hearing before punishment for the usual contempt. Federal Rules of Criminal Procedure, rule 42, 18 U.S.C.A.

Against this I find no countervailing precedent to negative the conclusion that this is a unique judgment of summary contempt. This is shown the clearer by considering the time intervals between the specific acts charged and the summary imposition of sentence. In some cases the acts occurred more than eight months before judgment and involved occurrences before the opening of the trial proper. On the other hand, the last acts charged against the lawyer appellants were respectively over four months, over two months, a month and a half, a month, and a month before the sentencing date.[1] The contrast between these time intervals and the extremely short periods of even the more drastic cases relied on is so great as to point its own moral.[2]

In justice to the trial judge it must be pointed out that he acted upon a perfectly rational theory, namely, that of a conspiracy to obstruct justice continuing up to the very end. If such a conspiracy in fact existed and thus continued, then the punishment was deserved and was indeed mild. But notwithstanding the provocation to the judge thus to conclude, this is not a matter of complete demonstration from acts alone. At the basis of any conspiracy is the intent of the parties; if the court refuses to accept testimony as to this, it is deliberately closing its eyes to important evidence. This, therefore, is surely a matter requiring a hearing for the reception of proffered testimony.

But the other alternative, that punishment here may be considered visited on the individual acts, involves a dilemma as great. There are not only the practical difficulties of the judge's own statement that he was punishing for the conspiracy rather than for acts which might well be considered as due to the heat of the trial, and of making sense out of his distribution of penalties, except upon his own rationale of conspiracy.[3] There is also the legal difficulty on

---

1. Sentence was pronounced October 14, 1949. The last act of contempt (the sole one during the trial proper) charged against appellant McCabe occurred on June 3, 1949, against Isserman, August 3, against Gladstein, August 26, and against Sacher and Crockett, September 14. The last contempt charged against the nonlawyer appellant, Dennis, occurred on October 4.

2. In the single federal case, In re Maury, 9 Cir., 1913, 205 F. 626, defendant was held in contempt the morning following the acts complained of and only after he was allowed to speak in his own defense. Resort to state cases as a guide to the contempt power of the federal courts has been termed "treacherous and unscientific." Frankfurter and Landis, Power of Congress over Procedure in Criminal Contempts in "Inferior" Federal Courts—A Study in Separation of Powers, 37 Harv.L.Rev. 1010, n. 2. Even so, in Re Willis, 1917, 94 Wash. 180, 162 P. 38, the defendant left the courtroom immediately after his contemptuous acts, and judgment was pronounced as

soon as he was brought before the court the following day. And in Middlebrook v. State, 1876, 43 Conn. 257, 21 Am.Rep. 650, while sixteen days had elapsed between the contempt and the judgment, the defendant had fled the jurisdiction immediately after committing the contemptuous acts and the intervening time was spent in trying to bring him into custody. True, I can discover no statement of the exact time interval in Re Cary, 1925, 165 Minn. 203, 206 N.W. 402; but such statements as that this power "must be exercised promptly, if exercised at all," and the reliance upon Ex parte Terry, 128 U.S. 289, 9 S.Ct. 77—the leading federal case where the Court continuously insists that the power be exercised "immediately," "instantly," or "without delay"—lead me to doubt its departure from the usual rule.

3. Thus the additional severe penalty against the nonlawyer appellant Dennis, who was also one of the convicted defendants, becomes understandable on the court's theory that he was one of the participants, indeed the leader, in the

the precedents referred to above, since quite obviously this trial was not being and was not broken up, but did in fact proceed to an orderly conclusion, with, indeed, what appears to be an improved attitude at least if the drying up of untoward incidents is any test.[4]

Certain suggested answers are not believed to be adequate. Thus it has been suggested that this was an unusual case presenting unusual situations. This indeed must be conceded. From the moment the prosecution planned to try so many defendants together on a charge of this nature, it was obvious to all but the most naive—indeed was freely stated in early newspaper comments referred to in the argument—that trial would be extraordinarily difficult, to put it mildly. But such burdens, whether foreseen or not, can hardly justify a change in the law for more summary procedure. One might even believe that the hoped-for gains from a prosecution of this kind would be lost unless it amounted to a demonstration of how American legal processes, operating in ordinary and unwarped fashion, could nevertheless accomplish justice.

Again it has been suggested that since the judge could have acted summarily at the time of each incident he should not lose the right by delaying to save the trial. But if the law is correctly stated above, this is a begging of the question. The matter is one not of honoring the judge's patience, but of following the course set by law for the circumstances as they actually exist. Summary punishment for contempt is not a right of the judge, the exercise of which he may postpone. It is an extraordinary exception to due process of law, justified only by the urgent needs of the moment. When the need for this drastic action passes, the power so to act also passes; and consonant with the long-standing mandate to use "the least possible power adequate to the end proposed," In re Michael, 326 U.S. 224, 227,

66 S.Ct. 78, 79, 90 L.Ed. 301; Anderson v. Dunn, 6 Wheat. 204, 19 U.S. 204, 5 L.Ed. 242, the more orderly processes of notice and hearing must be employed. If the judge had acted immediately to punish summarily what he deemed to be contempts, he would have done so as a responsible decision upon the need then apparent to him; and the issue which would thereupon have been presented to a reviewing court would have been quite different from that now before us. It does not seem to me appropriate or fruitful to try now to speculate how we might then have decided. The point is that the judge actually decided otherwise, and with perspicacity if we may conclude from the outcome. Since he did decide to postpone action, our review must be centered upon the legal consequences of that decision in the light of the precedents; these are not properly to be reshaped or reversed by speculation as to a different course he might have taken.

It is suggested, too, that the hearing (which under Rule 42(b), Federal Rules of Criminal Procedure, should be before another judge, since the contempt charged "involves disrespect to or criticism of a judge" and thus disqualifies him from sitting except by consent) may be dispensed with because it will produce the same result as has the present proceeding. Due process, however, accords a hearing to those believed to be clearly guilty as well as to those having a good possibility of acquittal. Moreover, on the issue which has become crucial—that of a conspiracy to obstruct justice—I do not see how we can be sure. Upon such an issue the matter of intent looms so large; indeed, the whole question as to the difference between acts done in hot or cold blood can hardly fail to take on a different significance in the light of testimony, subjected to proper cross-examination, of the parties as to their purposes, and what they had agreed to in trial preparation

conspiracy. So appellant McCabe's more limited participation in acts charged (see note 1 supra) might make his punishment seem drastic unless he was in fact a coconspirator.

4. See the time intervals set forth in note 1 supra. So twenty-nine of the thirty-

nine acts charged occurred in the first five months of these nine-month proceedings—twelve before the start of the trial proper. The ten acts cited during the last four months of the trial appear to be of a less serious nature than the earlier acts.

and what was not discussed. We must bear in mind that over and over again the charge consists of pressing a colloquy with the judge—in which the judge participated—to the point of exasperation. I do not see how we can conclude that this was obviously all a matter planned before the start of each colloquy. Moreover, the issue was not alone that of the existence of the conspiracy, but also of the participation of each in one if proven. A hearing was necessary at least to settle the degrees of guilt; quite possibly it would result in much heavier penalties to some than were actually given. A hearing therefore seems to me a prerequisite to punishment as a matter of law.

I would go further, however, and say that a hearing, with full evidence, is wholly desirable on wise policy. What we seek is the proper, decorous, and benign administration of justice. Were that to be promoted by condign punishment here, I, too, should want to reshape a hesitant law to make it possible. But because I believe profoundly that it will be hindered by hasty action here, I find it wiser to stick by the ancient precedents. I go back to what I said earlier that the law should be inexorable, but not vindictive. We cannot wisely permit officers of the court lightly to traduce justice; but on the other hand we cannot afford to overload the sacred responsibility of providing adequate defense for all to the point where it cannot practically be fulfilled. It is no secret that the difficulty of securing counsel to defend adequately unpopular minority groups is great, and indeed acute in nonmetropolitan districts. On the other hand, the insistence upon counsel as a part of the constitutional element of a fair trial is more pronounced, more precisely stated, each judicial term. There may be approaching the dilemma that trial cannot be had without counsel, and yet none can be found for the burdensome job. Between the two important demands it behooves us to walk circumspectly. I know of no wiser course than to proceed deliberately according to the wisdom of the law as developed in other and perhaps less emotional times, and to approach judgment and punishment deliberately, but by that course the more surely

and justly. I would order the proceedings remanded for hearing upon the charges as outlined in the certificate of the judge.